FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2013 JUL 12 AM 9: 25

CLERK'S
AT BALTIMORE

BY_____

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)**

RANJITH KEERIKKATTIL
4707 Grand Bend Drive
Catonsville, MD 21228
    Plaintiff,

Case No. ___**WMN 13 CV 2016**___

v.

FREEMAN A. HRABOWSKI, individually
and in his official capacity as President of
University of Maryland, Baltimore County;
NANCY L. YOUNG, individually and in her
official capacity as Vice-President for Student
Affairs at University of Maryland, Baltimore
County; JEFFREY E. CULLEN, individually
and in his official capacity as the Director of
Office of Student Judicial Programs at
University of Maryland, Baltimore County;
PAUL DILLON, individually and in his official
capacity as the Deputy Chief of Police at
University of Maryland, Baltimore County
1000 Hilltop Road,
Baltimore, MD 21250

**JURY TRIAL REQUESTED**

and

WILLIAM E. KIRWAN, individually and in his
official capacity as the Chancellor of the University
System of Maryland on behalf of University of
Maryland, Baltimore County, a public university;
BOARD OF REGENTS OF THE UNIVERSITY
SYSTEM OF MARYLAND, individually and in
their official capacity on behalf of University of
Maryland, Baltimore County, a public university
3300 Metzerott Road,
Adelphi, MD 20783

and

SOUTRY DE, individually
334 N. Beaumont Avenue
Catonsville, MD 21228

SERVE ON:

Katherine Bainbridge, Esq.
Deputy Counsel for Litigation
Educational Affairs Div. Higher Education
Office of the Attorney General
200 St. Paul Place
Baltimore, Maryland 21202-2021
Kbainbridge@oag.state.md.us

Soutry De
334 N. Beaumont Avenue
Catonsville, MD 21228
sde1@umbc.edu

       Defendants.

_____/


## COMPLAINT – CIVIL ACTION


### NATURE OF ACTION

    1. This is an action for declaratory and injunctive relief and for damages arising out of the Defendants tortious acts that resulted in the wrongful sanctions against Plaintiff Ranjith Keerikkattil. Defendants actions, which were in violation of both federal and state law, were taken to achieve a predetermined result and with deliberate disregard of the consequences to Plaintiff and the grievous harm that he would suffer and have suffered. The Plaintiff also alleges constitutional and civil rights violations under 42 U.S.C. § 1983 against University of Maryland, Baltimore County (UMBC), a public university, which receives funds from the State of Maryland and is a State related university.

## JURISDICTION AND VENUE

2. The Federal District Court for the District of Maryland has jurisdiction over the matter under 42 U.S.C. § 1983, 42 U.S.C. § 1988 and 28 U.S.C. § 1343 among other statutes.

3. This Court has jurisdiction to award damages pursuant to 28 U.S.C. § 1343, declaratory relief pursuant to 28 U.S.C. § 2201, injunctive relief pursuant to 42 U.S.C. § 1983 and Fed. R. Civ. P. 65, and attorney's fees and costs pursuant to 42 U.S.C. § 1988.

4. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Defendants reside in this district and/or all of the acts described in this Complaint occurred in this district.

5. Regarding claims of state law violations including Breach of Contract, Negligence and Intentional Infliction of Emotional Distress, this Court has supplemental jurisdiction over those claims pursuant to 28 U.S.C. § 1367. Those claims derive from a common nucleus of operative fact and arise from the same facts, transactions and occurrences as Plaintiff's allegations in support of his claims under 42 U.S.C § 1983 and the United States Constitution. See 28 U.S.C. § 1367(a); *United Mine Workers of America v. Gibbs,* 383 U.S. 715; 86 S. Ct. 1130; 16 L. Ed. 2d 218 (1966).

## PLAINTIFF

6. Plaintiff is Ranjith Keerikkattil, an individual, who resides at 4707 Grand Bend Drive, Catonsville, MD 21228.

## DEFENDANTS

7. Defendant Freeman A. Hrabowski is, and was at times relevant to this Complaint, the President of the University of Maryland, Baltimore County, a public university organized and existing under the laws of the State of Maryland. As such, Defendant Hrabowski is responsible for overseeing campus administration and policy-making, including the policies and procedures

3

contained herein. Defendant Hrabowski is sued both in his individual and official capacities.

8. Defendant Nancy L. Young is, and was at times relevant to this Complaint, the Vice President of Student Affairs at the University of Maryland, Baltimore County. As such, Defendant Young is responsible for overseeing campus administration and policy-making, including the policies and procedures contained herein. Besides, Defendant Young has direct supervisory responsibility over The Office of Student Judicial Programs (SJP) at UMBC. Defendant Young is sued both in her individual and official capacities.

9. Defendant Jeffrey E. Cullen is, and was at times relevant to this Complaint, the Director of Office of Student Judicial Programs (SJP) at the University of Maryland, Baltimore County. As such, Defendant Cullen is responsible for directly overseeing the day to day administration of the Code of Student Conduct. Defendant Cullen is sued both in his individual and official capacities.

10. Defendant Paul Dillon is, and was at times relevant to this Complaint, the Deputy Chief of Police at the University of Maryland, Baltimore County. As such, Defendant Dillon is responsible for the operational functions of the UMBC Police Department. Besides, Defendant Dillon was a Charging Party in the Student Judicial Proceeding against the Plaintiff Ranjith Keerikkattil. Defendant Dillon is sued both in his individual and official capacities.

11. Defendant William E. Kirwan is, and was at times relevant to this Complaint, the Chancellor of the University System of Maryland. As such, Defendant Kirwan is responsible for the management of the University System of Maryland and has all the powers, rights, and privileges that go with that responsibility. Defendant Kirwan is sued both in his individual and official capacities.

4

12. Defendants The Board of Regents of the University System of Maryland, under Md. Code Ann. Ed § 12-104(c)(1) "is responsible for the management of the University System of Maryland and has all the powers, rights, and privileges that go with that responsibility, including the power to conduct or maintain any institutions, schools, or departments in the University at the locations the Board determines." The Board of Regents of the University System of Maryland is an entity subject to suit under Md. Code Ann. Ed § 12-104(b)(3). UMBC, a public university in Maryland, is part of the University System of Maryland. Defendants The Board of Regents of the University System of Maryland are sued both in their individual and official capacities.

13. Defendant Soutry De was at times relevant to this Complaint, an undergraduate student at the University of Maryland, Baltimore County. She was a Charging Party as well as a complaining witness in the student judicial hearing against the Plaintiff Ranjith Keerikkattil. Charges against the Plaintiff were brought mainly based on her false and/or misleading statements.

## FACTUAL BACKGROUND

### Md. Education Code Ann. § 12-106

14. **Md. Education Code Ann. § 12-106 (f)** states that the Presidents of USM Institutions, the Chancellor and Board of Regents of University System of Maryland ("USM") are responsible for adopting policies regarding discipline, suspension, expulsion, or reinstatement of any student.

*§ 12-106. Plan for and administration of University*

5

*(f) Discipline of students; conduct of student organizations and athletic programs. -- In consultation with the Chancellor and the presidents, the Board may adopt policies providing for:*

*(1) The discipline, suspension, expulsion, or reinstatement of any student;*

**USM Policies on Student Affairs**

15. In 1990, the USM Board of Regents adopted a policy empowering the presidents of the constituent institutions to establish rules governing student affairs, including rules governing residential life and student organizations. This policy provides:

*Each President shall establish rules for the administration of student affairs, including, but not limited to, resident life, student discipline, and the handling of student grievances at the institution. Such rules shall serve to further educational and cultural objectives through student government and activities.*

*Each institution shall publish and distribute to all students a student handbook with pertinent policies, rules, and regulations.*

**COMAR Title 13b (COMAR 13B.02.02.19)**

16. The Code of Maryland Regulations, commonly referred to as COMAR is the official compilation of all regulations issued by agencies of the State of Maryland. Regulations concerning Higher Education in Maryland is compiled under Title 13b of COMAR.

**COMAR 13B.02.02.19.F.**

*An in-State institution shall develop a statement of the rights, privileges, and responsibilities of students, and make this statement available to students through the catalog, student handbook, or other appropriate means.*

**COMAR 13B.02.02.19.G.**

*An in-State institution shall adhere to published student grievance procedures that assure a fair and timely review of student complaints.*

<u>**UMBC Student Handbook**</u>

17. According to COMAR 13B.02.02.19.F. and USM Policy on Student Affairs, UMBC publishes a Student Handbook for its students. Besides being given to students, it's also published online at http://www.umbc.edu/saf/policies/pdfs/UMBC_Studenthandbook_2011-2012.pdf. The Student Handbook contains the Code of Student Conduct Statement on Page 21.

*Code of Student Conduct Statement*

*The UMBC is strongly committed to the development of the student and promotion of personal integrity and self-responsibility. Students enrolling at UMBC become citizens of the community and are entitled to enjoy the privileges and required to assume the responsibilities associated with this affiliation. The University consistently strives to create a community that welcomes and celebrates differences. Since the rights of all students are to be protected, and an atmosphere conducive to intellectual development, personal growth, and campus community are to be promoted, standards and guidelines on student behavior are necessary. The Office of Student Judicial Programs supports the University's dedication to student success and its educational purposes and goals by publishing, enforcing, drafting and interpreting standards of student behavior and*

*related policies and procedures. The Code of Student Conduct is intended to: outline*

*certain responsibilities and expectations of UMBC students, assist students in*

*understanding their role in the academic community, and establish procedures that*

*ensure due process in the adjudication of complaints concerning students. The Code of*

*Student Conduct can be found at the Student Judicial Programs Web site.*

**Code of Student Conduct**

18. On information and belief, Defendants Hrabowski, Young, Cullen, or their predecessors in office drafted, adopted, approved, or supervised the creation of UMBC's Code of Student Conduct.

19. According to UMBC, all students are required to comply with UMBC's Code of Student Conduct, under which a student can receive sanctions ranging from disciplinary reprimand to probation to suspension and dismissal.

20. The Code of Student Conduct in its entirety is published on the Student Judicial Programs Web site at http://www.umbc.edu/sjp/pdfs/Code%20of%20Student%20Conduct.2011-2012.pdf.

21. The Code of Student Conduct explicitly promises Due Process rights and protections for students.

**Article I. Student Conduct and Judicial Affairs Mission**

*The University of Maryland Baltimore County is strongly committed to the*

*development of the student and promotion of personal integrity and self-*

*responsibility. Students enrolling at UMBC become citizens of the community and are*

*entitled to enjoy the privileges and required to assume the responsibilities associated*

*with this affiliation. UMBC affirms its commitment to achieving diversity in higher education and continues to improve the quality and increase the diversity of its student body. The University consistently strives to create a community that welcomes and celebrates differences. Since the rights of all students are protected, and an atmosphere conducive to intellectual development, personal growth, and community association are to be promoted, standards and guidelines on student behavior are necessary. This Code of Student Conduct is intended to outline certain responsibilities and expectations of UMBC students, assist the students to understand their role in the academic community, and to establish procedures that ensure due process in the adjudication of complaints concerning students.*

**Article II. Purpose, General Provisions & Philosophy**

B.  *The primary purpose of this Code of Student Conduct is to serve the interests of both the UMBC community and the individual student by: (1) prescribing the standards of conduct expected of students; (2) outlining actions which can be taken when misconduct occurs; (3) establishing procedures which ensure due process in the adjudication of complaints concerning students; and (4) imposing sanctions in the University setting to protect, deter, and educate.*

C.  *The Student Judicial Programs Office promotes the concepts of fairness and due process in Student Conduct Review settings throughout the University community, while striking a balance between community standards and individual behavior through the educational development of students.*

**UMBC Student Due Process Rights**

22. UMBC explicitly defines and publishes Student Due Process Rights on its website at www.umbc.edu/sjp/dueprocess.html. Accordingly,

*Due Process requires adequate notice to the Charged Student informing him or her of:*

*1. The precise allegations filed against him or her. The student should be able to clearly and easily understand the specifics of the alleged behavior and the date, time and location of the incident.*

*2. The name of the Charging Party. The Office name is satisfactory.*

*3. The specific regulations for which the student is charged with violating. If you fail to include a regulation in your Charge letter, you should not add it at the Conference. In extraordinary incidences, you may obtain the student's written consent to add a different charge at the Conference.*

*4. The forum of the Conference or Hearing.*

*5. The date and location of the Conference or Hearing.*

*6. The names of witnesses to be called against the student at a Hearing.*

*7. A summary of the witnesses' planned testimonies prior to the Hearing.*

*8. A statement of the student's rights at the Hearing.*

*9. The possible sanctions. You do not have to share the exact sanction you plan to recommend, however, you should give a general idea.*

*10. The right to appeal.*

## Title IX

23. Title IX applies to all public and private educational institutions that receive federal funds, including colleges and universities. The statute prohibits discrimination on the basis of sex in a school's "education program or activity," which includes all of the school's operations. 20 U.S.C. §§ 1681(a), 1687. A school specifically agrees, as a condition for receiving federal funds, to operate all of its programs and activities in compliance with Title IX and the Department of Education's Title IX regulations. This agreement is known as an "assurance of compliance." 34 C.F.R. § 106.4(a)-(c).

24. The University as a recipient of federal funds, is bound by Title IX and its regulations, and, upon information and belief, has executed an assurance of compliance. Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance *procedures providing for the prompt and equitable resolution of student. .. complaints alleging* any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice) (emphasis added).

25. On October 1, 2012 Soutry De filed a report with UMBC Police alleging that she thinks she is being stalked. However, Ms. De does not state any threats of bodily injury, assault, sexual assault, rape, false imprisonment or death that constitute the statutory definition of stalking under Maryland law.

26. On October 2, 2012, Mr. Chris Tkacik, The University Counsel at UMBC sent the Plaintiff, Ranjith Keerikkattil a letter banning him from campus based just on Ms. De's statement and without conducting any investigation.

27. On October 3, 2012, Ms. De appeared before a judge for a Peace Order Hearing

against Mr. Keerikkattil at the District Court in Catonsville. The judge dismissed her peace order petition ex-parte at the temporary stage. In dismissing her petition, the judge specifically ruled that the Plaintiff had not threatened her in any form.

28. A couple of weeks later when Mr. Keerikkattil was trying to register for classes, he found a judicial hold on his account asking him to contact the Office of Student Judicial Programs (SJP). Mr. Keerikkattil then contacted SJP inquiring about the judicial hold placed on his account.

29. Jeffrey Cullen, the Director of SJP informed Mr. Keerikkattil that Mr. Paul Dillon, the Deputy Chief of UMBC Police and Ms. De would now want to bring charges under Rule 2 of UMBC's Code of Student Conduct.

30. A Charge Letter was sent to Mr. Keerikkattil dated November 1, 2012. The charges on the Charge Letter were vague and ambiguous and contained no information regarding the date and time of the incidents that contributed to the alleged violations under Rule 2 of UMBC's Code of Student Conduct.

31. On November 5, 2012, Mr. Keerikkattil met with Defendants Dillon and Cullen for Pre-Hearing conference. Pre-Hearing conferences are held before the Hearing and students charged with alleged violations of Code of Student Conduct. The charged student could accept or deny violations of Code of Student Conduct. Mr. Keerikkattil denied all allegations against him. He further asked what the basis for applying these charges were since he was never an enrolled student at the university during the time of these allegations.  He looked confused. At this time Mr. Dillon began whispering the word "ban" to Mr. Cullen. Mr. Keerikkattil was asked to go out of the room and Mr. Dillon talked with Mr. Cullen in private. After about half-an-hour, Mr. Keerikkattil was asked back in and he was served with a unilateral and one-sided No Contact

Order that put Mr. Keerikkattil at the risk of further sanctions. When asked about why the order was unilateral when no investigation was done and Mr. Dillon did not have any evidence, they said Ms. De is more believable since she is a woman.

32. It became clear to Mr. Keerikkattil that Mr. Dillon and Cullen were not interested in determining the facts rather than charging him. Also, Mr. Keerikkattil began to doubt about the impartiality of Dr. Cullen as Director of SJP and whether he would get justice and fairness in the Student Judicial System at UMBC.

33. Since Mr. Dillon and UMBC Police did not take any effort to investigate the allegations raised by Ms. De in her complaint, Mr. Keerikkattil decided to investigate them. He obtained a copy of the Police Report from UMBC Police. He also went to the District Court Records Room in Towson to obtain a copy of the rejected Peace Order Petition that Ms. De had filed.

34. Based on the information available from the Police Report, Ms. De's Peace Order petition and his investigation, Mr. Keerikkattil wrote to Mr. Cullen disputing Ms. De's claims along with supporting evidences. Further, since the evidences point to misrepresentation of facts by Ms. De, Mr. Keerikkattil also alleged her with violations of Code of Student Conduct. Dr. Cullen said that he would investigate Mr. Keerikkattil's claims.

35. In the meantime, Ms. De continued her behavior of harassing and threatening Mr. Keerikkattil. Mr. Keerikkattil petitioned a District Judge and a Peace Order was entered against Ms. De restraining all forms of contact by her towards him.

36. Finding inaction from Dr. Cullen, Mr. Keerikkattil wrote a letter to him asking about the delays in investigating his claims. Mr. Keerikkattil also pointed out to him that UMBC took action on Ms. De's claims within hours and that he worries he is unfairly discriminated. He also

copied Dr. Hrabowski and Dr. Young. Dr. Cullen was unhappy that Mr. Keerikkattil copied them. He also said that it is perfectly normal for Ms. De to be treated differently from Mr. Keerikkattil. Also, Mr. Keerikkattil found that the confidential letter that he had sent to Dr. Cullen with both Mr. Dillon and Ms. De. Dr. Cullen did later admit that he had forwarded it to Mr. Dillon.

37. The Hearing against Mr. Keerikkattil was held on December 12, 2012. On the day of the Hearing, Mr. Keerikkattil saw Mr. Cullen, Mr. Dillon and Ms. De meet in a closed room about 9:15 AM. A few minutes after the meeting at 9:28 AM, Mr. Cullen sent Mr. Keerikkattil an e-mail informing him that he had decided to confer De "victim" status.

38. Mr. Keerikkattil was only made aware of this e-mail minutes before the Hearing started. He had already read the Family Educational Rights and Privacy Act (FERPA) regulations and knew that "victim" under FERPA means a victim of "crime of violence" or a "nonforcible sex offense". This stunned him since none of the allegations against him pointed to any "crime of violence" or a "nonforcible sex offense" under FERPA.

39. Mr. Keerikkattil protested this since not only was this conferral baseless, but it would also permit disclosures that would otherwise be prohibited under FERPA. He wanted to reschedule the Hearing and wanted an attorney to be present. Mr. Cullen did not agree and informed him that the Hearing would proceed even in his absence and sanctions would be imposed on him.

40. Besides, the e-mail also stated that another UMBC student named David Sweigart would be testifying as a witness for the Charging Party. Mr. Keerikkattil was surprised by this since he did not know who this person was, a fact Mr. Sweigart would himself state at the Hearing.

41. Mr. Keerikkattil reluctantly agreed to participate in the Hearing. At the Hearing Mr. Dillon testified that Ms. De's testimony is "100% credible" even when he did not conduct an investigation himself on the authenticity of Ms. De's claims, a fact that he also later admitted in the Circuit Court for Baltimore County. Also, he stated towards the end of the Hearing that he was looking for a six month suspension but since Mr. Keerikkattil challenged his claims, he now wants an indefinite suspension and campus ban.

42. Dr. Cullen participated in the Hearing as an advisor to the Hearing Board. At the beginning of the Hearing, the Chair of the Hearing Board, Sagar Bajpai made it clear that an advisor shall not participate or interrupt the Hearing. Throughout the Hearing, Dr. Cullen appeared to be irritated. He appeared as if he wanted to finish the Hearing at the earliest and impose his pre-planned sanctions. He interrupted Mr. Keerikkattil multiple times while he was questioning the witnesses thereby preventing an effective cross examination of witnesses.

43. During the deliberations process Dr. Cullen influenced the outcome of the Hearing Board. First of all, he exclusively had the discretion to select the Hearing Board members. So he only included people he could influence. He gave the Hearing Board a copy of the Code of Student Conduct that had Rule 2 explicitly missing, the Rule under which Mr. Keerikkattil was charged. In other words, the claims against Mr. Keerikkattil were evaluated based on Dr. Cullen's interpretation of Rule 2 and his definition of stalking. Further, even the Hearing Board seemed confused with the definition of Rule 2. In fact, Dr. Cullen himself says to the Hearing Board that Rule 2 had been found to be unconstitutionally vague and overbroad in the *Rock for Life-UMBC v. Hrabowski* lawsuit.

44. The Hearing Board could not come to a consensus regarding the allegations against Mr. Keerikkattil, so Dr. Cullen forces it up on the Hearing Board. He even says to the Chair of

15

the Hearing Board "you do not have to write this down" and "let me get the wording to hang this on". There is absolutely no doubt that Mr. Keerikkattil was railroaded here.

45. Dr. Cullen states on the Sanction Letter that the Hearing Board mandated the sanction of suspension. However, the Hearing Board never even discussed any sanctions against him. In fact it was Dr. Cullen who came up with them.

46. Dr. Cullen used his authority to impose the maximum sanctions against Mr. Keerikkattil – over one year to indefinite suspension, ban from UMBC Campus till 2016 and 100 hours of Community Restitution.

47. It is well settled that Mr. Keerikkattil as a student at a public university is protected by Due Process Rights. Public university disciplinary committees are clearly arms of the state and therefore meet the state action requirement of the Due Process Clause. Besides Mr. Keerikkattil has a well-established liberty and property interests in pursuing his education.

48. Defendants failed to provide Mr. Keerikkattil the precise allegations filed against him including but not limited to the date, time and location of the incidents that form the basis for the charges against him. Mr. Keerikkattil was unable to come up with a proper defense without specifics of allegations against him. Even during the Hearing, the Charging party never specified the date and time regarding each of the allegations against Mr. Keerikkattil. Also, the charges "showing up uninvited at place of work or places where she frequents more than once" are vague and misleading since Mr. Keerikkattil and Ms. De used to work together.

49. Defendants promised Mr. Keerikkattil adequate notice informing him of the names of witnesses that the University would call against him at a Hearing as well as a summary of the witnesses' planned testimonies prior to the Hearing. However, the Defendants informed Mr. Keerikkattil that the University would be bringing witnesses only minutes before Hearing.

16

50. Defendants allowed the witnesses to testify in the Hearing even when the Charging Party missed its deadline in submitting the witness list and the witnesses testimony was used to find Mr. Keerikkattil responsible for a charge - "contacted her by striking up conversation with her in the UMBC Library after it was made plainly clear by Ms. De and by a Baltimore County Police Officer that further contact was unwelcome and potentially unlawful" which was not even there in the Charge Letter.

51. Since, UMBC's case rests solely on the credibility of its witnesses, David Sweigart and Soutry De. Mr. Sweigart had already stated that he is a close friend of Ms. De and had taken a lot of classes with her. Mr. Keerikkattil had found during his investigation that Mr. Sweigart works at the same place as Ms. De in Dr. Michael Hayden's Lab. Besides, Mr. Sweigart from his own statement had admitted that Ms. De shares her homeworks with him in violation of UMBC's Academic Integrity Policy under which students could be suspended or dismissed from UMBC for plagiarism.

52. Mr. Sweigart has a lot to benefit from forging a false testimony for Ms. De. Further, Mr. Sweigart's testimony was short of specifics and it appeared as if he had been coached. In fact, parts of his testimony at the Hearing contradicted his statements made before the Hearing as well as statements made by Ms. De.

53. Soutry De stated that she saw Mr. Keerikkattil following her home in April 2012. However, Ms. De and Mr. Keerikkattil became friends on Facebook in early May 2012. No one with common sense would become friends with someone whom she suspects is following or harassing her. However, when asked for any evidence to support her claims, she said she has none.

17

54. She stated that Mr. Keerikkattil said to her that he was going to Giant Supermarket the day she alleged that he had followed her. Of all the places, Giant raises a red flag because there is a Giant opposite to Mr. Keerikkattil's home at a walkable distance on 4622 Wilkens Avenue. So her claim cannot be true since there is no logical reason for Mr. Keerikkattil to go to a Giant that's more than 4 miles from his home when there's one less than 0.2 miles away at a walkable distance.

55. Ms. De and Mr. Keerikkattil used to work together even after April and she never raised it to him or anyone else at the workplace during this period. In short, the claim by Ms. De that she saw Mr. Keerikkattil following her home in April 2012 was fabricated to strengthen her claims.

56. Ms. De stated on her Peace Order petition that Mr. Keerikkattil showed up at her home uninvited on July 8, 2012. While investigating, Mr. Keerikkattil found a Facebook posting made by Ms. De that shows her in Las Vegas on July 8, 2012. When confronted with this evidence, Ms. De then stated that she made a "mistake" on her Peace Order petition. Hence by her own admission, Ms. De had most likely violated Md. Courts and Judicial Proceedings Code Ann. § 3-1503(d), a misdemeanor under state law.

57. Ms. De stated in her complaint to UMBC Police that she saw Mr. Keerikkattil looking at her during Summer 2012 and felt threatened. During the Hearing, her testimony changed to she saw Mr. Keerikkattil on a public space working on his laptop and she didn't see where his eyes were. Later, when asked why she didn't contact Police that time, her answer was he didn't try to contact her and hence was not threatened. This contradicts her own claims made before. This also contradicts almost all of UMBC charges against Mr. Keerikkattil because Ms. De now

states that she wasn't threatened by his physical presence.

58. Ms. De stated in her complaint to UMBC Police that Mr. Keerikkattil threatened her by talking to her "Hello. How are you doing?" at UMBC Library on September 29, 2012 at 3 PM. Mr. Keerikkattil had presented receipts before the Hearing to show that he was at The Mall in Columbia at this time. Knowing this, Ms. De then changed the time to between 4 and 5:30 PM. From all this it is quite clear that Ms. De knowingly would have made false statements with UMBC Police in violation of Md. Criminal Law Code Ann. § 9-501.

59. Ms. De then tried to take out a Peace Order against Mr. Keerikkattil. The judge dismissed her peace order petition ex-parte at the temporary stage. In dismissing her petition, the judge specifically ruled that Mr. Keerikkattil was not a threat to her in any form. Finding that she couldn't establish the burden of proof under criminal law or even for a Temporary Peace Order, she came up with the idea along with Mr. Dillon of using UMBC's Judicial System where they could use their influence find Mr. Keerikkattil responsible.

60. The Student Judicial process against Mr. Keerikkattil was nothing but a carefully planned and calculated action by her to cause him great harm that she could not achieve through the state courts.

61. During the Hearing, one of the Hearing Board members, Kristin Waters recalls an incident from her past where she saw a white van following her. In the end she says that what she was mistaken but still thinks that's a reason to be threatened. Other members agree with her. This is relevant in context of this case since Ms. De made an unsubstantiated claim during the Hearing that she saw Mr. Keerikkattil following her home about eight months ago in April. In other words, the Hearing Board would have found Mr. Keerikkattil responsible even if Ms. De had no evidence to substantiate her claim since they were prejudiced. This goes contrary to the

procedures and safeguards promised by UMBC that states that the student would be judged solely on the evidence presented before the Hearing Board.

62. Under the equitable standard of Title IX, both Mr. Keerikkattil and Ms. De have equal rights. Issuing a one-sided No Contact Order against only Mr. Keerikkattil that threatens him with more sanctions, when no such order was issued against Ms. De fails the equitable standard under Title IX.

63. Dr. Cullen refused to allow Mr. Keerikkattil access to the Pre-Hearing recordings before the Hearing as early as November despite his multiple requests. These recordings would have clearly proven Title IX violations against UMBC. Again, when Mr. Keerikkattil asked for the recording in April 2013, UMBC then said that the audio recorder malfunctioned. Mr. Keerikkattil strongly believes that the audio recording was intentionally destroyed since it would support his Title IX claims and incriminate Defendants Cullen and Dillon.

64. It would be highly unlikely that the audio recorder malfunctioned not once or twice but twenty three times and no one at UMBC noticed it especially when the Pre-Hearing Conference forms a very important part of the Student Judicial Process at UMBC. Also, the video portion of the recording which UMBC showed Mr. Keerikkattil was only 25 minutes when the Pre-Hearing Conference lasted more than an hour. This indicates that UMBC might have also edited the video recording too.

65. Dr. Cullen failed to explain Mr. Keerikkattil the basis for the sanctions despite Mr. Keerikkattil repeatedly asking him. Davonya Hall, Dr. Cullen's deputy stated in the Appellate Board Decision Letter stated that the sanctions against Mr. Keerikkattil were consistent with sanctions for violations of Rule 2. However, Rule 2 contains anything from drug overdose to rape and it would be incredulous to believe that a student found responsible for indecent

exposure would get the same sanctions as a student found responsible for rape.

66. Both Federal and State of Maryland definition of stalking requires the threat of serious bodily injury or death. However, UMBC's definition of stalking does not require any threat of serious bodily injury or death. In fact, UMBC's definition of stalking is so vague and overbroad that it's void for vagueness.

67. UMBC's definition of stalking and Rule 2 contains nebulous terms like "health" and "safety" that it does not define. So the health could be emotional health and safety could be emotional safety.

68. UMBC had already acknowledged before that terms like "intimidation," "emotional harassment," and "emotional safety" that constitute Rule 2 were unconstitutionally vague and overbroad in the *Rock for Life-UMBC v. Hrabowski* lawsuit.

69. Dr. Cullen conferred Ms. De "victim" status abruptly just before the Hearing. A "victim" under FERPA means a victim of "crime of violence" or a "nonforcible sex offense". Had such an allegation made against him in a court of law, he would have received his due process protections under Brady Disclosure and Jenks Act that were denied during UMBC's judicial proceedings against Mr. Keerikkattil.

70. Chris Tkacik, University Counsel served Mr. Keerikkattil at the Circuit Court of Baltimore County, a letter on January 15, 2013 that he said was the decision of the Appellate Board written by Davonya Hall, Dr. Cullen's deputy. According to the letter, Ms. Hall wrote that Appellate Board met on January 11, 2013 and upheld sanctions against Mr. Keerikkattil. The letter was used at the Circuit Court where Ms. De was a Defendant, for her defense.

71. Mr. Keerikkattil was quite sure that neither did the Appellate Board meet on January 11th nor did they uphold the sanctions against him. So he asked both Ms. Hall and Mr. Tkacik to

confirm under penalty of perjury that they witnessed the meeting of Appellate Board and the approval of sanctions against him. Both of them declined. Obviously, as attorneys, they both know the consequences of providing false information under penalty of perjury.

72. Mr. Keerikkattil had written to Freeman Hrabowski, the President of UMBC and Nancy Young, Vice President of Student Affairs at UMBC even before the Hearing expressing his concerns regarding Dr. Cullen and Mr. Dillon and if he would get a fair and unbiased Hearing under UMBC's judicial system.

73. Faced with delays on his appeal, he again wrote to Dr. Hrabowski, who replied back apologizing for the delays. Finding that UMBC Administration was unwilling to address his concerns, Mr. Keerikkattil wrote to William Kirwan, Chancellor of the University System of Maryland and Janice Doyle, Chief of Staff to the Board of Regents of the University System of Maryland. After reviewing Mr. Keerikkattil's allegations, Ms. Doyle informed him that they had forwarded his allegations to the Office of Attorney General for review. Also, Ms. Tracey Jamison, Director of Enrollment contacted Mr. Keerikkattil to let him know that she is awaiting review from the Office of Attorney General and would get back to him.

74. However, Mr. Keerikkattil never got a response back on his allegations. He even contacted back Ms. Doyle, Ms. Jamison as well as Mr. Thomas Faulk, the Chief Counsel for The Board of Regents at the Office of Attorney General but got no reply. It was clear to him that the University System of Maryland like UMBC Administration had taken the policy of deliberate indifference to his plight exacerbating his injuries.

75. None of the allegations raised against Mr. Keerikkattil occurred when he was an enrolled student at UMBC. Hence, irrespective of the factual accuracy of the allegations against him, Mr. Keerikkattil cannot be held responsible under UMBC Code of Student Conduct for

22

allegations that fall outside the jurisdiction of UMBC and SJP in both "venue" and "time".

76. Ms. De never had to face a Hearing Board for alleged violations of UMBC's Code of Student Conduct despite Mr. Keerikkattil having written to SJP multiple times regarding them. The only difference between allegations against Ms. De and Mr. Keerikkattil was that Ms. De had the explicit support of senior UMBC officials like Mr. Dillon and Dr. Cullen that Mr. Keerikkattil did not have.

77. Mr. Keerikkattil had voluntarily quit his job at Community College of Baltimore County ("CCBC") which he had held for the past four years because of Ms. De's harassment as well as false and misleading claims against him. She did continue to work there after he left. Also, a District Judge did find Ms. De responsible for harassing Mr. Keerikkattil and ordered her to refrain from harassing, stalking or threatening him.


## COUNT I

### 42 U.S.C. § 1983: Fourteenth Amendment Due Process

78. Plaintiff incorporates paragraphs 1 through 77 as if fully pleaded.

79. As a student at a public university, Plaintiff enjoyed a constitutionally protected fundamental right and interest in continuing his education.

80. As a student at a public university, Plaintiff enjoyed a constitutionally protected property interest in continuing his education.

81. Plaintiff's reputation and his opportunity to pursue future educational and employment opportunities constitute a constitutionally protected liberty interest.

82. Defendants' suspension of Plaintiff from the University of Maryland, Baltimore County was arbitrary and capricious and motivated by bad faith.

83. Plaintiff was not afforded an unbiased, careful and deliberate review process either prior to or following his suspension from the university.

84. Defendants made false charges and accusations against Plaintiff which stigmatized him and severely damaged his opportunities for future education and employment.

85. Plaintiff was denied a meaningful opportunity to clear his name.

86. In depriving Plaintiff of his constitutionally protected rights, including his fundamental right to and property interest in continuing his public university education, and his liberty interest in his reputation and opportunity to pursue future education and employment, Defendants' actions abridged him of his rights to due process of law in violation of the Fourteenth Amendment of the United States Constitution.

87. Defendants acting under the color of state law and in concert with one another, by their conduct, showed intentional, outrageous, and reckless disregard for Plaintiff's constitutional rights. Defendants acting under the color of state law and in concert with one another, acted out of vindictiveness and ill will towards Plaintiff.

88. At all times, Plaintiff had a clearly established right to due process of law of which a reasonable public official would have known.

89. As a direct and foreseeable result, Plaintiff have sustained, and will continue to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

## COUNT II

### 42 U.S.C. § 1983: First Amendment Retaliation

90. Plaintiff incorporates paragraphs 1 through 89 as if fully pleaded.

91. Mr. Keerikkattil was retaliated with more severe sanctions because he exercised his First Amendment Rights and challenged the Defendants' claims against him.

92. Defendant Dillon himself said during the Hearing that he was looking for a six month suspension but wanted an indefinite suspension and campus ban after the Plaintiff challenged his claims during the Hearing.

93. Defendants sanctions were pretextual and had no basis or precedent other than to inflict maximum harm on the Plaintiff.

94. Because the law is clearly established in this area, and because Defendants had (and have) fair warning that punishing a student from a public university in retaliation for the exercise of First Amendment rights is unconstitutional, Defendants are liable individually and in their official capacities, for violating the Plaintiff's First Amendment rights.

95. As a direct and proximate result, Plaintiff suffered and will continue to suffer irreparable harm, injury, damages, including but not limited to, monetary damages, loss of career opportunities and earning capacity, mental and emotional distress, anxiety and mental anguish, humiliation and embarrassment; and loss of personal and professional reputation.

## COUNT III

### Breach of Contract

96. Plaintiff incorporates paragraphs 1 through 95 as if fully pleaded.

97. Mr. Keerikkattil applied to and was admitted to on the understanding and expectation that the University would implement and enforce the promises and policies made in its official publications, including the Student Handbook, the Code of Student Conduct, and other relevant documents, including those not mentioned in this complaint.

98. An express contract or, alternatively, a contract implied in law or in fact, was therefore formed between the University and Plaintiff. Defendants' failure and refusal to abide by the terms of that contract or implied contract constituted a breach of said contract.

99. All of the foregoing breaches of contract were wrongful, without lawful justification or excuse, prejudicial, and were part of an effort to achieve a predetermined result in Mr. Keerikkattil's case: a finding that he had violated Rule 2 of the Code of Student Conduct.

100. As a direct and foreseeable result of these breaches of contract, Plaintiff have sustained, and will continue to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

## COUNT IV

### Promissory Estoppel

101. Plaintiff incorporates paragraphs 1 through 100 as if fully pleaded.

102. As described above, the Student Handbook, the Code of Student Conduct and the other official University publications constitute promises that the University should have reasonably expected to induce action or forbearance on the part of the Plaintiff.

26

103. The University should have expected Plaintiff to accept its offer of admission to Mr. Keerikkattil based on the University's representations that it would honor its express and implied promises, including that of fundamental fairness and the implied covenant of good faith and fair dealing.

104. Plaintiff relied to his detriment on these express and implied promises and representations made by the University.

105. Injustice can only be avoided by enforcement of the University's promises and representations.

106. As a direct and foreseeable result of the University's failure to honor its promises and representations, Plaintiff have sustained, and will continue to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

## COUNT V

### Negligence

107. Plaintiff incorporates paragraphs 1 through 106 as if fully pleaded.

108. Having put in place a student disciplinary process, including the Policies and Procedures, the University owed a duty of care to Plaintiff and others to conduct that process in a non-negligent manner and with due care.

109. The applicable standard of care is informed by the Maryland Statutory Code, Code of Maryland Regulations, Title IX and other Federal Regulations.

110. The University's conduct, as described above, fell below the applicable standard of care and amounted to a breach of the University's duty of care.

111. The University's breaches of the duty of care caused Plaintiff, in fact and proximately, to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

## COUNT VI

### Negligence Per Se

112. Plaintiff incorporates paragraphs 1 through 111 as if fully pleaded.

113. Title IX, COMAR Title 13b and other Federal and State Regulations create statutory duties that the University was obligated to perform.

114. Plaintiff is a person within the protections of Title IX, COMAR Title 13b and other Federal and State Regulations and is intended to be benefited thereby.

115. The University's violations of these statutes and its failure to perform its duties thereunder as described above have proximately caused injury to Plaintiff, constitute negligence per se, and are actionable.

116. The University's breaches caused Plaintiff, in fact and proximately, to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

## COUNT VII

### Gross Negligence

117. Plaintiff incorporates paragraphs 1 through 116 as if fully pleaded.

118. As set forth above, the University has engaged in conduct that amounts to ordinary negligence and negligence per se.

119. The University's actions were taken with such a reckless disregard for the rights of others that a conscious indifference to consequences is implied in law. The University's actions evidence a conscious neglect of duty, a callous indifference to consequences, and such an entire want of care as would raise a presumption of a conscious indifference to consequences.

120. The University has acted willfully, intentionally, and recklessly. The University was reckless in that it was aware of, but consciously disregarded, a substantial and unjustifiable risk of injury or damage to Plaintiff. The University's disregard of this risk was a gross deviation from the standard of care.

121. The University's gross negligence has caused Plaintiff, in fact and proximately, to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

## COUNT VIII

### Negligent Training and Supervision of Employees

122. Plaintiff incorporates paragraphs 1 through 121 as if fully pleaded.

29

123. As described above, these employees lacked the proper training in order to carry out their responsibilities under the Student Judicial System, Title IX, and other Federal and State statutes.

124. As alleged above, these employees committed negligent, grossly negligent, and intentional tortious acts that caused injuries to the Plaintiff.

125. The University knew, or in the exercise of due care, should have known of these employees' lack of training and inability to carry out their responsibilities under the Student Judicial System, Title IX, and other Federal and State statutes.

126. The University's negligent failure to train and supervise these employees directly and foreseeably caused injuries to the Plaintiff. Had the University taken appropriate steps to train and supervise these employees, such steps would, more probably than not, have prevented the injuries.

127. The University's breach of its duty to ensure proper training and adequate supervision for these employees proximately caused the Plaintiff to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.


## COUNT IX

### Intentional Infliction of Emotional Distress

128. Plaintiff incorporates paragraphs 1 through 127 as if fully pleaded.

129. The University's conduct described above was extreme and outrageous; done willfully and intentionally without regard to the consequences for Plaintiff; and was part of an

effort to achieve a predetermined result in Mr. Keerikkattil's case: a finding that he had violated Rule 2 of the Code of Student Conduct and its definition of stalking. As such, the conduct was so outrageous that it is not tolerated by civilized society.

130. The University's conduct did actually and proximately cause Plaintiff mental anguish, severe emotional distress, and serious mental injury, as well as other substantial injury, damage, and loss.

## COUNT X

### Civil Conspiracy and Concert of Action

131. Plaintiff incorporates paragraphs 1 through 130 as if fully pleaded.

132. Defendants acted together to cause the Plaintiff the injuries alleged herein.

133. The actions of Defendants constituted concert of action.

134. As a direct and proximate result of this concert of action, Plaintiff was injured.

135. Defendants worked with one another to engage in conduct violated state and federal statutory and common law. That conduct constitutes an agreement to accomplish an unlawful objective, which is a conspiracy.

136. Defendants acting in concert participated in tortious actions against Plaintiff in furtherance of a common design, intention and purpose to deny him his Due Process Rights and the opportunity for a free and fair Hearing.

137. Plaintiff has suffered and will continue to suffer substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects as a result of Defendants' conspiracy.

## COUNT XI

### Malicious Use of Civil Process

138. Plaintiff incorporates paragraphs 1 through 137 as if fully pleaded.

139. The student judicial process against Mr. Keerikkattil was a malicious use of civil process by the Defendants.

140. Defendants had presumed Mr. Keerikkattil guilty from the beginning by banning him from campus and issuing one-sided No Contact Orders against him before any determination of facts.

141. UMBC Defendants conferred Ms. De "victim" status at the last minute without any legal basis to permit disclosure of sanctions against Mr. Keerikkattil that would otherwise be illegal under FERPA.

142. These sanctions against the Plaintiff was used in Ms. De's defense at the Circuit Court for Baltimore County.

143. Defendants through their tortious acts deprived the Plaintiff his right for a fair and unbiased trial causing him to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

## COUNT XII

### Defamation

144. Plaintiff incorporates paragraphs 1 through 143 as if fully pleaded.

145. Defendants' aforementioned representations were false and malicious.

146. Defendants knew that the information was false or misleading.

147. Defendants published the remarks to third parties with the knowledge of the falsity of the statements or in reckless disregard of truth or falsity.

148. Defendant's statements were not privileged.

149. Defendant's statements were defamation per se.

150. Defendant's defamatory statements resulted in seriously damaging Plaintiff's reputation.

151. As a direct and proximate result, Plaintiff suffered and will continue to suffer irreparable harm, injury, damages, including but not limited to, monetary damages, loss of career opportunities and earning capacity, mental and emotional distress, anxiety and mental anguish, humiliation and embarrassment; and loss of personal and professional reputation.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Ranjith Keerikkattil respectfully requests that the Court enter judgment against Defendants Hrabowski, Young, Cullen, Dillon, De, Kirwan and The Board of Regents of the University System of Maryland and that the Court provide the Plaintiff with the following relief:

(A) Issue a preliminary and permanent injunction invalidating and restraining enforcement of UMBC's sanctions against the Plaintiff;

(B) Issue an order declaring that the Defendants violated the Plaintiff's rights to due process of law;

(C) Issue an order requiring the University to expunge all records relating to the disciplinary proceeding against the Plaintiff from University records;

(D) Issue an order requiring the University to update its records to reflect that the Plaintiff is in good standing with no disciplinary record whatsoever and to so represent in the event of any third-party inquiry;

(E) Award Plaintiff compensatory damages in an amount to be determined at trial for mental anguish, severe emotional distress, serious mental injury, injury to reputation, past and future economic loss, deprivations of due process, loss of educational opportunities, loss of future career prospects, and other injuries proximately caused by the wrongful conduct of the Defendants;

(F) Award Plaintiff punitive damages in an amount to be established at trial to punish the Defendants for its wrongful, willful, intentional, and reckless conduct;

(G) Award Plaintiff their attorney's fees, disbursements, and costs pursuant to the provisions of 42 U.S.C. § 1988 or pursuant to any other statute or common law doctrine providing for the award of attorney's fees, disbursements, and/or costs;

(H) Award prejudgment interest; and

(I) Grant such other and further relief as the Court may deem just and proper.


## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all claims so triable.

Dated: July 12, 2013

Respectfully submitted,

_____

Ranjith Keerikkattil
Plaintiff, pro se
4707 Grand Bend Drive
Catonsville, MD 21228.
Telephone: (443) 690-1031
rkeerikkattil@gmail.com