FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2013 JUL 12  AM 9: 25

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
CLERK'S OFFICE
AT BALTIMORE

(Northern Division)

BY_____

RANJITH KEERIKKATTIL,                          *

      Plaintiff,                                  *

     v.                                            *          Civil Action No.:      **WMN 13 CV 2016**

FREEMAN HRABOWSKI, et al.,                     *

                       *

      Defendants.                               *

      *   *   *   *   ooo0ooo   *   *   *   *

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S
## MOTION FOR PRELIMINARY INJUNCTION

Ranjith Keerikkattil
4707 Grand Bend Drive
Catonsville, MD 21228
Telephone: (443) 690-1031
rkeerikkattil@gmail.com

Plaintiff, pro se

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS ....................................................................................................3

ARGUMENT.........................................................................................................................9

  I. Mr. Keerikkattil satisfies the requirements for the issuance of a preliminary injunction......9

    A.   Mr. Keerikkattil has a reasonable likelihood of success on the merits. .......................10

    B.   Mr. Keerikkattil will suffer irreparable harm if the injunction is not granted. ............43

    C.   The Equities Weigh Heavily in Favor of Granting the Requested Relief....................44

    D.   Granting the Preliminary Injunction Will Advance the Public Interest.......................45

  II. Mr. Keerikkattil is prepared to post a bond. ....................................................................46

CONCLUSION......................................................................................................................46

## TABLE OF AUTHORITIES

### Cases

*Absolon v. Dollahite,* 376 Md. 547,
  831 A.2d 6 (2003) ..................................................................................................................33

*Albert v. Carovano,*
  824 F.2d 1333 (2d Cir. 1987)..............................................................................................13

*Barbour v. People of the State of New York,*
  620 N.Y.S.2d 892 (N.Y. Sup. Ct. 1994) ............................................................................40

*Barrett v. West Chester Univ. of Pa. of State Sys. of Higher Educ.,*
  No. 03-cv-4978, 2003 WL 22803477 (E.D. Pa. Nov. 12, 2003) ...........................................45

*BG & E v. Lane,*
  338 Md. 34, 656 A.2d 307, 311 (1995)................................................................................33

*Blackwelder Furniture Co. v. Seilig Mfg. Co.,*
  550 F.2d 189 (4th Cir. 1977)...................................................................................................9

*Board of Regents v. Roth,*
  408 U.S. 564 (1972) ..............................................................................................................12

*Brady v. Maryland,*
  373 US. 83 (1963) .................................................................................................................39

*Chambers v. Mississippi,*
  410 US. 284 (1973) ...............................................................................................................19

*Cheek v. United States,*
  498 U.S. 192 (1991) ...............................................................................................................23

*Chief Montgomery County Department of Police v. Jacocks,*
  436 A.2d 930 (Md. Ct. Spec. App. 1981) ..........................................................................40

*Cohen v. Brown Univ.,*
  809 F. Supp. 978 (D.R.I. 1992)............................................................................................45

*Damazo v. Wahby,*
   259 Md. 627 (1970).................................................................................................36

*Dearmore v. City of Garland,*
   400 F. Supp.2d 894 (N.D. Tex. 2005)......................................................................43

*Deerfield Med. Ctr. v. City of Deerfield Beach,*
   661 F.2d 328 (5th Cir. 1981)...................................................................................43

*Duke v. North Texas State Univ.,*
   469 F.2d 829 (5th Cir. 1972)...................................................................................10

*EEOC v. Los Alamos Constructors,* Inc.,
   382 F. Supp. 1373 (D.N.M. 1974) ...........................................................................39

*Elrod v. Burns,*
   427 U.S. 347 (1976) .................................................................................................43

*Ewing v. Board of Regents of Univ. of Mich.,*
   742 F.2d 913 (6th Cir. 1984)...................................................................................11

*Fontell v. Hassett,*
   2011 WL 4632579 (D. Md. Oct. 3, 2011).................................................................37

*Gargiul v. Tompkins,*
   704 F.2d 661 (2d Cir. 1983).....................................................................................27

*Gorman v. University of Rhode Island,*
   837 F.2d 7 (1st Cir. 1988) ........................................................................................10

*Goss v. Lopez,*
   419 U.S. 565 (1975) .................................................................................................13

*Greco v. State Police Merit Board,*
   245 N.E.2d 99 (Ill. App. Ct. 1969)..........................................................................40

*Green v. Washington Suburban Sanitary Comm'n,*
   259 Md. 206 (1970)...................................................................................................37

*Hall v. University of Minn.,*
  530 F. Supp. 104 (D. Minn. 1982) ........................................................................................11

*Harlow v. Fitzgerald,*
  457 U.S. 800, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982) ......................................................35

*Henson v. Honor Comm. of Univ. of Va.,*
  719 F.2d 69 (4th Cir. 1983).................................................................................................11

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.,*
  174 F.3d 411 (4th Cir. 1999)................................................................................................46

*Independent Newspapers, Inc. v. Brodie,*
  966 A.2d 432 (Md. 2009)......................................................................................................42

*Jaksa v. Regents of Univ. of Mich.,*
  597 F. Supp. 1245 (E.D. Mich. 1984) ..................................................................................13

*Jones v. Board of Governors of the University of North Carolina*
  704 F.2d 713 (4th Cir. 1983)............................................................................................10, 12

*Keys v. Chrysler Credit Corp.,*
  494 A.2d 200 (Md. 1985).....................................................................................................37

*Lloyd v. General Motors Corp.,*
  397 Md. 108 (2007)..............................................................................................................36

*Martin v. Halstad,*
  578 F. Supp. 1473 (W.D. Wis. 1983)...................................................................................11

*Mitchell v. Cuomo,*
  748 F.2d 804 (2d Cir. 1984).................................................................................................43

*NLRB v. Adhesive Prods. Corp.,*
  258 F.2d 403 (2d Cir. 1958).................................................................................................40

*Nobby Lobby, Inc. v. City of Dallas,*
  767 F. Supp. 801 (N.D. Tex. 1991)......................................................................................43

*Ohio v. Roberts,*
  448 U.S. 56 (1980) ............................................................................................................... 19

*Parks v. Dunlop,*
  517 F.2d 785 (5th Cir. 1975) ................................................................................................ 43

*Pavel Enters. v. A.S. Johnson Co.,*
  674 A.2d 521 (Md. 1996) ...................................................................................................... 15

*Pearson v. Callahan,*
  555 U.S. 223, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009) ....................................................... 35

*Real Truth About Obama, Inc. v. Fed. Election Comm'n,*
  575 F.3d 342 (4th Cir. 2009) .................................................................................................. 9

*Rock for Life-UMBC v. Hrabowski,*
  594 F. Supp. 2d 598 (D. Md. 2009) ...................................................................................... 30

*Rocks v. Brosius,*
  241 Md. 612, 217 A.2d 531 (1966) ....................................................................................... 16

*Rosenblatt v. Exxon,*
  335 Md. 58, 642 A.2d 180 (1994) .......................................................................................... 33

*Saucier v. Katz,*
  533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001) ..................................................... 35

*Shaw v. Stroud,*
  13 F.3d 791 (4th Cir. 1994) ................................................................................................... 34

*South Carolina Medical Ass'n v. Thompson,*
  327 F.3d 346 (4th Cir. 2003) ................................................................................................. 29

*Sperry & Hutchinson Co. v. FTC,*
  256 F. Supp. 136 (S.D.N.Y. 1966) ........................................................................................ 40

*Spiegel v. City of Houston,*
  636 F.2d 997 (5th Cir. 1981) ................................................................................................. 43

*Suarez Corp. Indus. v. McGraw,*
    202 F.3d 676 (4th Cir. 2000)................................................................................................25

*Taylor v. NationsBank, N.A.,*
    365 Md. 166, 776 A.2d 645 (2001)......................................................................................16

*Thompson v. Bass,*
    616 F.2d 1259 (5th Cir. 1980)..............................................................................................27

*Todd v. Mass Transit Administration,*
    373 Md. 149, 816 A.2d 930 (2003).......................................................................................33

*United States v. Aaron,*
    457 F.2d 865 (2d Cir. 1972).................................................................................................40

*United States v. Williams,*
    553 U.S. 285 (2008)............................................................................................................29

*United States v. Wills,*
    346 F.3d 476 (4th Cir. 2003)................................................................................................29

*Van Royen v. Lacey,*
    262 Md. 94 (1971)..............................................................................................................36

*W. Va. Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave,*
    553 F.3d 292 (4th Cir. 2009)..................................................................................................9

*Winnick v. Manning,*
    460 F.2d 545 (2d Cir. 1972)..........................................................................................16, 19

*Winter v. Natural Res. Def. Council, Inc.,*
    129 S. Ct. 365, 555 US 7, 172 L. Ed. 2d 249 (2008)..............................................................9

*Wisconsin v. Constantineau,*
    400 U.S. 433 (1971)............................................................................................................11

## Statutes and Regulations

18 U.S.C. § 3500........................................................................................................................40

18 U.S.C. § 2261A .........................................................................................................29

20 U.S.C. § 1681(a) ..................................................................................................8, 26

28 C.F.R. § 54.135(b) ....................................................................................................9

34 C.F.R. § 106.4(a)-(c)..................................................................................................9

34 C.F.R. § 106.8(b) .......................................................................................................9

COMAR 13B.02.02.19.F...................................................................................4, 31, 32

COMAR 13B.02.02.19.G ................................................................................4, 32, 33

Md. Criminal Law Code Ann. § 3-802 ........................................................................29

Md. Criminal Law Code Ann. § 9-501 ........................................................................24

Md. Education Code Ann. § 12-106 (f) .............................................................3, 31, 33

Md. Courts and Judicial Proceedings Code Ann. § 3-1503(d) ....................................23

**Rules**

Fed. R. Civ. P. 65(c) .....................................................................................................46

**Constitutional Provisions**

*U.S. CONST. amend. XIV* .....................................................................................10, 36

## TABLE OF EXHIBITS

Ex. 1        Md. Education Code Ann. § 12-106

Ex. 2        USM Policy on Student Affairs

Ex. 3        COMAR 13B.02.02.19

Ex. 4        UMBC Student Handbook (Pg. 21)

Ex. 5        UMBC Code of Student Conduct

Ex. 6        UMBC Student Due Process Rights

Ex. 7        Sanction Letter

Ex. 8        Jeff Cullen's E-mail Dated December 12, 2012

Ex. 9        Testifying Witness Form

Ex. 10       Charge Letter

Ex. 11       Appellate Board Decision Letter

Ex. 12       Soutry De Facebook Friend Confirmation May 2012

Ex. 13       Giant Map

Ex. 14       Soutry De's Facebook Posting July 2012

Ex. 15       Court Issued Peace Order against Soutry De

Ex. 16       No Contact Order

Ex. 17       Davonya Hall's E-mail regarding access to the Pre-Hearing recording

Ex. 18      E-mail concerning fairness of UMBC'S Student Judicial Process

Ex. 19      Freeman Hrabowski's E-mail regarding delays

Ex. 20      E-mail thread involving UMBC, USM Chancellor and Board of Reagents

Ex. 21      Rachel Grissom's E-mail

Ex. 22      SALI Entry of Appearance

Ex. 23      Booz Allen Hamilton Offer Letter

Ex. 24      Maryland State Senatorial Scholarship

## PRELIMINARY STATEMENT

Plaintiff Ranjith Keerikkattil is and was at times relevant to this complaint a graduate student at the University of Maryland, Baltimore County ("UMBC") from where he also graduated with his bachelor's degree in 2010. This case arises from disciplinary sanctions imposed against the Plaintiff by UMBC in violation of his due process rights based on false and/or misleading statements made by another UMBC student Soutry De. Ms. De was supported by Paul Dillon of UMBC Police who claimed Ms. De to be "100% credible" without conducting an investigation as well as Jeffrey E. Cullen who misused his position as the Director of Office of Student Judicial Programs ("SJP") at UMBC to deprive his ability to continue his education.

The basis for disciplinary action against Mr. Keerikkattil stems from a complaint that Soutry De filed with UMBC Police on October 1, 2012 alleging that she thinks she is being stalked. However, Ms. De does not state any threats of bodily injury, assault, sexual assault, rape, false imprisonment or death made by Mr. Keerikkattil towards her that constitute the statutory definition of stalking under Maryland law.

Mr. Keerikkattil and Ms. De used to be friends and colleagues until she became estranged with him and started making false and/or misleading statements about him. This forced him to quit his job at Community College of Baltimore County ("CCBC") which he had held for the past four years to avoid contact with her fearing her intentions. Ms. De did continue to work there after he left.

UMBC banned Mr. Keerikkattil from its campus the next day even before conducting an investigation of its own. Neither did it conduct any investigation to verify Ms. De's claims ever despite multiple requests from Mr. Keerikkattil himself. But it did charge him with violating

1

Rule 2 of its Code of Student Conduct.

Mr. Keerikkattil has already pointed to the Defendants multiple times about the Due Process Violations made by the University. It even had an opportunity as early as December 2012 to conduct a rehearing that would have addressed the Procedural Due Process Violations he had pointed out to them. Instead, the University tried to cover-up and deny its inappropriate actions causing further harm to the Plaintiff.

The University's actions caused Plaintiff, in fact and proximately, to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

Accordingly, Mr. Keerikkattil seeks a preliminary injunction requiring the Defendants to revoke sanctions against him until a final ruling is made by the Court. Specifically, Mr. Keerikkattil seeks (1) to require UMBC to remove the judicial hold on his account and enable him to register for classes, (2) to require UMBC to remove the campus ban against him, and (3) to remove the "Disciplinary Suspension" notation from his transcript so that it does not harm his current and future educational and employment opportunities. As set forth below, the Mr. Keerikkattil is entitled to a preliminary injunction because (1) he is likely to prevail on the merits, (2) he is likely to suffer irreparable injury in the absence of a preliminary injunction, (3) the balance of equities tips in his favor and (4) a preliminary injunction would advance the public interest. The Defendant does not face any costs of its own in complying with the preliminary injunction.

## STATEMENT OF FACTS

### Md. Education Code Ann. § 12-106

**Md. Education Code Ann. § 12-106 (f)** states that the Presidents of USM Institutions, the Chancellor and Board of Regents of University System of Maryland ("USM") are responsible for adopting policies regarding discipline, suspension, expulsion, or reinstatement of any student.

*§ 12-106. Plan for and administration of University*

*f) Discipline of students; conduct of student organizations and athletic programs. -- In consultation with the Chancellor and the presidents, the Board may adopt policies providing for:*

*(1) The discipline, suspension, expulsion, or reinstatement of any student;*

**Md. Education Code Ann. § 12-106** is attached as **Ex. 1**.


### USM Policies on Student Affairs

In 1990, the USM Board of Regents adopted a policy empowering the presidents of the constituent institutions to establish rules governing student affairs, including rules governing residential life and student organizations. This policy provides:

*Each President shall establish rules for the administration of student affairs, including, but not limited to, resident life, student discipline, and the handling of student grievances at the institution. Such rules shall serve to further educational and cultural objectives through student government and activities.*

*Each institution shall publish and distribute to all students a student handbook with pertinent policies, rules, and regulations.*

3

**USM Policy on Student Affairs** is attached as **Ex. 2**.


## COMAR Title 13b (COMAR 13B.02.02.19)

The Code of Maryland Regulations, commonly referred to as COMAR is the official compilation of all regulations issued by agencies of the State of Maryland. Regulations concerning Higher Education in Maryland is compiled under Title 13b of COMAR.

**COMAR 13B.02.02.19.F.**

*An in-State institution shall develop a statement of the rights, privileges, and responsibilities of students, and make this statement available to students through the catalog, student handbook, or other appropriate means.*

**COMAR 13B.02.02.19.G.**

*An in-State institution shall adhere to published student grievance procedures that assure a fair and timely review of student complaints.*

**COMAR 13B.02.02.19** is attached as **Ex. 3**.


## UMBC Student Handbook

According to COMAR 13B.02.02.19.F. and USM Policy on Student Affairs, UMBC publishes a Student Handbook for its students. Besides being given to students, it's also published online at http://www.umbc.edu/saf/policies/pdfs/UMBC_Studenthandbook_2011-2012.pdf. The Student Handbook contains the Code of Student Conduct Statement on Page 21.

4

*Code of Student Conduct Statement*

*The UMBC is strongly committed to the development of the student and promotion of personal integrity and self-responsibility. Students enrolling at UMBC become citizens of the community and are entitled to enjoy the privileges and required to assume the responsibilities associated with this affiliation. The University consistently strives to create a community that welcomes and celebrates differences. Since the rights of all students are to be protected, and an atmosphere conducive to intellectual development, personal growth, and campus community are to be promoted, standards and guidelines on student behavior are necessary. The Office of Student Judicial Programs supports the University's dedication to student success and its educational purposes and goals by publishing, enforcing, drafting and interpreting standards of student behavior and related policies and procedures. The Code of Student Conduct is intended to: outline certain responsibilities and expectations of UMBC students, assist students in understanding their role in the academic community, and establish procedures that ensure due process in the adjudication of complaints concerning students. The Code of Student Conduct can be found at the Student Judicial Programs Web site.* **Page 21 of UMBC Student Handbook** is attached as **Ex. 4**.

## Code of Student Conduct

On information and belief, Defendants Hrabowski, Young, Cullen, or their predecessors in office drafted, adopted, approved, or supervised the creation of UMBC's Code of Student Conduct.

5

According to UMBC, all students are required to comply with UMBC's Code of Student Conduct, under which a student can receive sanctions ranging from disciplinary reprimand to probation to suspension and dismissal.

The Code of Student Conduct in its entirety is published on the Student Judicial Programs Web site at http://www.umbc.edu/sjp/pdfs/Code%20of%20Student%20Conduct.2011-2012.pdf. The Code of Student Conduct explicitly promises Due Process rights and protections for students.

### Article I. Student Conduct and Judicial Affairs Mission

*The University of Maryland Baltimore County is strongly committed to the development of the student and promotion of personal integrity and self-responsibility. Students enrolling at UMBC become citizens of the community and are entitled to enjoy the privileges and required to assume the responsibilities associated with this affiliation. UMBC affirms its commitment to achieving diversity in higher education and continues to improve the quality and increase the diversity of its student body. The University consistently strives to create a community that welcomes and celebrates differences. Since the rights of all students are protected, and an atmosphere conducive to intellectual development, personal growth, and community association are to be promoted, standards and guidelines on student behavior are necessary. This Code of Student Conduct is intended to outline certain responsibilities and expectations of UMBC students, assist the students to understand their role in the academic community, and to establish procedures that ensure due process in the adjudication of complaints concerning students.*

6

### Article II. Purpose, General Provisions & Philosophy

*B. The primary purpose of this Code of Student Conduct is to serve the interests of both the UMBC community and the individual student by: (1) prescribing the standards of conduct expected of students; (2) outlining actions which can be taken when misconduct occurs; (3) establishing procedures which ensure due process in the adjudication of complaints concerning students; and (4) imposing sanctions in the University setting to protect, deter, and educate.*

*C. The Student Judicial Programs Office promotes the concepts of fairness and due process in Student Conduct Review settings throughout the University community, while striking a balance between community standards and individual behavior through the educational development of students.*

UMBC's **Code of Student Conduct** is attached as **Ex. 5**.

### UMBC Student Due Process Rights

UMBC explicitly defines and publishes Student Due Process Rights on its website at www.umbc.edu/sjp/dueprocess.html. Accordingly,

*Due Process requires adequate notice to the Charged Student informing him or her of:*

*1. The precise allegations filed against him or her. The student should be able to clearly and easily understand the specifics of the alleged behavior and the date, time and location of the incident.*

*2. The name of the Charging Party. The Office name is satisfactory.*

7

*3. The specific regulations for which the student is charged with violating. If you fail to include a regulation in your Charge letter, you should not add it at the Conference. In extraordinary incidences, you may obtain the student's written consent to add a different charge at the Conference.*

*4. The forum of the Conference or Hearing.*

*5. The date and location of the Conference or Hearing.*

*6. The names of witnesses to be called against the student at a Hearing.*

*7. A summary of the witnesses' planned testimonies prior to the Hearing.*

*8. A statement of the student's rights at the Hearing.*

*9. The possible sanctions. You do not have to share the exact sanction you plan to recommend, however, you should give a general idea.*

*10. The right to appeal.*

UMBC SJP's webpage containing **Student Due Process Rights** is attached as **Ex. 6**.


## Title IX

Title IX applies to all public and private educational institutions that receive federal funds, including colleges and universities. The statute prohibits discrimination on the basis of sex in a school's "education program or activity," which includes all of the school's operations. 20 U.S.C. § 1681(a), 1687. A school specifically agrees, as a condition for receiving federal funds, to operate all of its programs and activities in compliance with Title IX and the

Department of Education's Title IX regulations. This agreement is known as an "assurance of compliance." 34 C.F.R. § 106.4(a)-(c).

The University as a recipient of federal funds, is bound by Title IX and its regulations, and, upon information and belief, has executed an assurance of compliance.

Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance *procedures providing for the prompt and equitable resolution of student. .. complaints alleging* any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice) (emphasis added).

## ARGUMENT

## I. Mr. Keerikkattil satisfies the requirements for the issuance of a preliminary injunction.

To secure a preliminary injunction in the Fourth Circuit, Mr. Keerikkattil would need to show that 1) he is likely to succeed on the merits; 2) he is likely to suffer irreparable harm absent the issuance of preliminary relief; 3) the balance of equities tips in his favor; and 4) a preliminary injunction is in the public interest. *W. Va. Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009) (quoting *Winter v. Natural Res. Def. Council, Inc.*, -- U.S. --, 129 S. Ct. 365, 374 (2008)). Following the Supreme Court's decision in *Winter*, the Fourth Circuit no longer applies the traditional "balance-of-hardship" test set out in *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189 (4th Cir. 1977). *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346-47 (4th Cir. 2009), *vacated*, -- S. Ct. --, 2010 WL

9

1641299 (Apr. 26, 2010). As established below, Mr. Keerikkattil has made the requisite showing for issuance of the requested preliminary injunction.

### A.      Mr. Keerikkattil has a reasonable likelihood of success on the merits.

**Mr. Keerikkattil as a student at a public university is protected by Due Process Rights**

It is well settled that Mr. Keerikkattil as a student at a public university is protected by Due Process Rights. The Due Process Clause of the Fourteenth Amendment provides, in relevant part, that "no state shall make or enforce any law which shall . . . deprive any person of life, liberty, or property, without due process of law." *U.S. CONST. amend. XIV, § 1*. Public university disciplinary committees are clearly arms of the state and therefore meet the state action requirement of the Due Process Clause. "[The] Fourteenth Amendment protects the citizen against all the creatures of the state—universities not excepted". *Duke v. North Texas State Univ.*, 469 F.2d 829, 837 (5th Cir. 1972) cert. denied, 412 U.S. 932 (1973). "[I]t is well settled that when a public school or state university takes disciplinary action against a student which, for any substantial length of time, deprives the student of the opportunity to continue his or her education, the school must afford student due process of law. *Jones v. Board of Governors of the University of North Carolina*, 557 F. Supp. 263 (W.D.N.C. 1983), aff'd, 704 F.2d 713 (4th Cir. 1983).

**Mr. Keerikkattil has a well-established property and liberty interest in his education**

The proposition that students have a property interest in their education can also be found in numerous federal court cases. *Gorman v. University of Rhode Island*, 837 F.2d 7 (1st Cir. 1988) ("It is also not questioned that student's interest in pursuing education is included within

fourteenth amendment's protection of liberty and property."); *Ewing v. Board of Regents of Univ. of Mich.*, 742 F.2d 913, 915 (6th Cir. 1984) ("[A]n implied understanding that a student shall not be arbitrarily dismissed from his university is a property interest."); *Hall v. University of Minn.*, 530 F. Supp. 104, 107 (D. Minn. 1982) ("A student's interest in attending a university is a property right protected by due process.");*Henson v. Honor Comm. of Univ. of Va.*, 719 F.2d 69, 73 (4th Cir. 1983) (assuming student had property interest).

Once an applicant has accepted an offer of admission, the prospective student has a sufficient property interest in admission prior to matriculation to require some procedural due process. *Martin v. Halstad*, 578 F. Supp. 1473, 1482 (W.D. Wis. 1983). The district court in this case had held that the applicant had a property interest in admission to the law school based on the school's offer of admission and the Plaintiff's acceptance of the offer. See *Id.* at 1475.

Suspensions or expulsions produce different types of liberty deprivations. The first type, identified in *Wisconsin v. Constantineau* comes from a finding of guilt or responsibility. *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971) (liberty interests involved "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him."). This can be clearly found from Dr. Cullen's words in the Sanction Letter attached, **Ex. 7**. In the Letter Dr. Cullen stated that Mr. Keerikkattil jeopardized the health or safety of self or others and also questions his integrity by requiring him to demonstrate integrity to return to UMBC. Statements made by Dr. Cullen have severely ruined his good name, reputation, honor and integrity.

The second type of liberty deprivation is the type of stigma identified in *Board of Regents v. Roth* which occurs when a suspended or expelled student attempts to transfer to or temporarily

attend another school, or applies for further graduate education. Most school applications require disclosure of serious disciplinary infractions. Such candor will result at most schools in a denial of the application. *Board of Regents v. Roth*, 408 U.S. 564, 573 (1972) (liberty interest invoked by imposition of a "stigma or other disability that foreclose[s] [the] freedom to take advantage of other opportunities."). The Sanction Letter clearly states that the sanction would be noted on Mr. Keerikkattil's transcript as "Disciplinary Suspension". This would negatively impact him in pursuing further education. In fact, UMBC's own graduate school application requires disclosure of disciplinary sanctions by students.

The third type of liberty deprivation is the delay in the ability to pursue employment opportunities. The Fourth Circuit Court of Appeals, in *Jones v. Board of Governors of the University of North Carolina*, recognized that a delay in the ability to pursue employment opportunities constitutes irreparable injury. 704 F.2d 713, 716 (4th Cir. 1983) ("As the district court concluded, without a preliminary injunction Jones will obviously suffer irreparable injury: she will be barred from taking courses during the spring semester, delaying the time at which her ability to work as a nurse will come to fruition; she will have a gap in her education which she will be forced to explain throughout her professional life; and she will be deprived of the opportunity to complete her education with her fellow classmates."). Cybersecurity is one of the fastest growing and highest paid specialties within IT especially in Maryland. Maryland is the Headquarters of National Security Agency (NSA) and U.S. Cyber Command as has one of the largest concentration of Cybersecurity jobs. In fact, the demand for cyber talent is so high that Mr. Keerikkattil's employer General Dynamics was willing to pay for the entire program through its Education Assistance Program. UMBC through its arbitrary and capricious sanctions have

12

delayed and severely impacted his career growth and earning potential.

The following are more Federal Court opinions that support the Plaintiff's claims of his liberty interests. *Goss v. Lopez*, 419 U.S. 565 (1975) at 575 ("liberty" interests implicated where high school student was suspended for ten days since suspension "could seriously damage the students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment"); *Albert v. Carovano*, 824 F.2d 1333, 1339, n.6 (2d Cir. 1987) (noting that ". . . at a minimum, the students' protected liberty interest is at stake because of the 'stigma' attached to suspension from college for disciplinary reasons"); *Jaksa v. Regents of Univ. of Mich.*, 597 F. Supp. 1245 (E.D. Mich. 1984) at 1247, 1254 (determining that Plaintiff's suspension from university involved a sufficient "liberty" interest to entitle him to Fourteenth Amendment guarantees, court noted that "[t]here is no question that Plaintiff's interest in uninterrupted education and remaining free from stigma are weighty").

## UMBC's failed to follow its own explicitly defined and published Student Due Process Rights

UMBC's Office of Student Judicial Programs (SJP) explicitly defines and publishes Due Process Rights for its students, **Ex. 6.**

Defendants failed to provide Mr. Keerikkattil the precise allegations filed against him including but not limited to the date, time and location of the incidents that form the basis for the charges against him. Mr. Keerikkattil was unable to come up with a proper defense without specifics of allegations against him. Even during the Hearing, the Charging party never specified the date and time regarding each of the allegations against Mr. Keerikkattil. The charges

13

"showing up uninvited at place of work or places where she frequents more than once" are vague and misleading since Mr. Keerikkattil and Ms. De used to work together.

Defendants promised Mr. Keerikkattil adequate notice informing him of the names of witnesses that the University would call against him at a Hearing as well as a summary of the witnesses' planned testimonies prior to the Hearing. However, the Defendants informed Mr. Keerikkattil that the University would be bringing witnesses only minutes before Hearing, **Ex. 8**. It is also interesting to note that one of the witnesses, David Sweigart himself admitted that he did not know Mr. Keerikkattil before. Further, the summary of the witnesses' planned testimonies submitted by the Charging Party were mere one liners and provided no specifics what so ever what their testimonies would contain, **Ex. 9**. It is important to note that the Hearing happens in one schedule, so the charged student does not get an opportunity to investigate the claims made in the testimonies giving the Charging Party a strategic advantage because any false statements or misrepresentations made by them could not be challenged. Obviously, without adequate notice and specificity of allegations against him, Mr. Keerikkattil had no serious chance of succeeding. Further, Defendants allowed the witnesses to testify in the Hearing even when the Charging Party missed its deadline in submitting the witness list and the witnesses testimony was used to find Mr. Keerikkattil responsible for a charge - "contacted her by striking up conversation with her in the UMBC Library after it was made plainly clear by Ms. De and by a Baltimore County Police Officer that further contact was unwelcome and potentially unlawful" which was not even there in the Charge Letter. The Charge Letter is attached as **Ex. 10.**

As stated above, UMBC found Mr. Keerikkattil responsible for a charge that was not even present in the Charge Letter. This again violates another of UMBC's published Due Process

14

Rights that states "The specific regulations for which the student is charged with violating. If you fail to include a regulation in your Charge letter, you should not add it at the Conference. In extraordinary incidences, you may obtain the student's written consent to add a different charge at the Conference." Mr. Keerikkattil never gave Dr. Cullen any written consent to add charges against him.


## UMBC explicitly promised Due Process Rights in its Student Handbook and Code of Student Conduct

Mr. Keerikkattil accepted admission to UMBC based on the University's representations that it would honor its express and implied promises. He believed that UMBC would always honor its promises made in its Student Handbook, Code of Student Conduct and SJP's website. He relied to his detriment on these express and implied promises and representations made by the University. Injustice can only be avoided by enforcement of the University's promises and representations.

To prevail on a claim of promissory estoppel under Maryland law, the Plaintiff needs to show that there was "(1) a clear and definite promise; (2) where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee; (3) which does induce actual and reasonable action or forbearance by the promisee; and (4) causes a detriment which can only be avoided by the enforcement of the promise." *Pavel Enters. v. A.S. Johnson Co.*, 674 A.2d 521, 532 (Md. 1996) (emphasis omitted). Hence, Mr. Keerikkattil has a high probability of succeeding on his promissory estoppel claim.

When Mr. Keerikkattil was offered admission by UMBC that he accepted, the University

15

entered into an express written contract with him. As the Maryland Court of Appeals had held in *Rocks v. Brosius,* a written contract can arise from several writings; it does not need to be on one piece of paper that all parties sign.

> "A contract need not be evidenced by a single instrument. Where several instruments are made a part of a single transaction they will all be read and construed together as evidencing the intention of the parties in regard to the single transaction. This is true even though the instruments were executed at different times and do not in terms refer to each other." *Rocks v. Brosius,* 241 Md. 612, 637, 217 A.2d 531, 545 (1966).

Conversely, if UMBC states that it did not enter a contract regarding the Student Handbook and Code of Student Conduct then neither is Mr. Keerikkattil obliged to follow the University's Code of Student Conduct nor its sanctions.

Under Maryland law, a Plaintiff claiming breach of contract need only show "that the Defendant owed the Plaintiff a contractual obligation and that the Defendant breached that obligation." *Taylor v. NationsBank, N.A.,* 365 Md. 166, 175, 776 A.2d 645, 651 (2001).

UMBC has breached its contractual obligations to Mr. Keerikkattil by failing to protect his Due Process Rights that it had contractually promised to him through its Student Handbook and Code of Student Conduct.

**UMBC failed to provide Plaintiff with an unbiased and impartial Hearing**

"While there remain many vexing questions as to what due process requires in school disciplinary proceedings, a fundamental requirement is that a Hearing must be accorded before an impartial decision maker." *Winnick v. Manning,* 460 F.2d 545, 448 (2d Cir. 1972). University

disciplinary Hearings, without a doubt, require that the student can plead his story to an unbiased tribunal. *Id.* at 548.

During the Hearing, one of the Hearing Board members, Kristin Waters recalls an incident from her past where she saw a white van following her. In the end she says that what she was mistaken but still thinks that's a reason to be threatened. Other members agree with her. This is relevant in context of this case since Ms. De made an unsubstantiated claim during the Hearing that she saw Mr. Keerikkattil following her home about eight months ago in April. In other words, the Hearing Board would have found Mr. Keerikkattil responsible even if Ms. De had no evidence to substantiate her claim since they were prejudiced. This goes contrary to the procedures and safeguards promised by UMBC that states that the student would be judged solely on the evidence presented before the Hearing Board.

Dr. Cullen participated in the Hearing as an advisor to the Hearing Board. At the beginning of the Hearing, the Chair of the Hearing Board, Sagar Bajpai made it clear that an advisor shall not participate or interrupt the Hearing. Throughout the Hearing, Dr. Cullen appeared to be irritated. He appeared as if he wanted to finish the Hearing at the earliest and impose his pre-planned sanctions. He interrupted Mr. Keerikkattil multiple times while he was questioning the witnesses thereby preventing an effective cross examination.

During the deliberations process Dr. Cullen influenced the outcome of the Hearing Board. First of all, he exclusively had the discretion to select the Hearing Board members. So he only included people he could influence. He gave the Hearing Board a copy of the Code of Student Conduct that had Rule 2 explicitly missing, the Rule under which Mr. Keerikkattil was charged. In other words, the claims against Mr. Keerikkattil were evaluated based on Dr. Cullen's

17

interpretation of Rule 2 and his definition of stalking. Further, even the Hearing Board seemed confused with the definition of Rule 2. In fact, Dr. Cullen himself says to the Hearing Board that Rule 2 had been found to be unconstitutionally vague and overbroad in the *Rock for Life-UMBC v. Hrabowski* lawsuit. The Hearing Board could not come to a consensus regarding the allegations against Mr. Keerikkattil, so Dr. Cullen forces it up on the Hearing Board. He even says to the Chair of the Hearing Board "you do not have to write this down" and "let me get the wording to hang this on". There is absolutely no doubt that Mr. Keerikkattil was railroaded here.

Dr. Cullen says on the Sanction Letter that the Hearing Board mandated the sanction of suspension. However, the Hearing Board never even discussed any sanctions against him. In fact Dr. Cullen came up with them and the Hearing Board members merely read out what Dr. Cullen had written up. Another clear evidence that these sanctions were Dr. Cullen and Mr. Dillon's creations are the words "Section 26-102" and "Ban from UMBC Campus". Dr. Cullen and Mr. Dillon have been fixated on this idea of banning Mr. Keerikkattil from UMBC for a long time. First Mr. Dillon through Mr. Chris Tkacik, the University Counsel sent Mr. Keerikkattil a Ban Letter on October 1, 2012 banning him from UMBC. When Mr. Dillon found out that UMBC cannot ban students, he worked with Dr. Cullen to extend the ban for another 8 weeks pending the Hearing. Using the Sanction Letter they extended the campus ban to 2015 and after finding that that Mr. Keerikkattil appealed the sanctions, they extended the ban through 2016. Mr. Dillon had openly stated during the Hearing that he is looking for an indefinite campus ban against Mr. Keerikkattil.

At the Hearing Mr. Dillon testified that Ms. De's testimony is "100% credible" even when he did not conduct an investigation himself on the authenticity of Ms. De's claims, a fact

that he also later admitted in the Circuit Court for Baltimore County.

Mr. Keerikkattil is willing to present excerpts from the Hearing that substantiates allegations raised above before the Court if so ordered. He had already shared them with many of the Defendants.

## UMBC interfered in the questioning of witnesses thereby preventing effective cross-examination

In instances where the credibility of witnesses is essential to finding a student guilty or innocent of the university's charge and determining the severity of the student's potential suspension or expulsion, cross-examination may be essential in administering a fair Hearing. *Winnick v. Manning*, 460 F.2d 545, 549 (2d Cir. 1972) (discussing the proposition that cross-examination is necessary to achieve fairness in a university disciplinary Hearing where there are serious issues as to witness credibility). In these "he-said-she-said" cases, cross-examination may be essential to due process because the weight the testimony is given will be highly dependent upon the credibility of the individual witness. *Id.* at 550. Statements that will be used as evidence of guilt, which are worth only as much as the credibility of the witness delivering them, should be subject to cross-examination because the outcome of the Hearing rides on the weight given to these statements. *Id.* at 549. Because the rights to confront and cross-examine witnesses are recognized as essential to due process, "the absence of proper confrontation at trial 'calls into question the ultimate integrity of the fact-finding process.'" *Ohio v. Roberts*, 448 U.S. 56, 64 (1980) (quoting *Chambers v. Mississippi*, 410 US. 284, 295 (1973)).

UMBC did not have any material evidence to support its claim that Mr. Keerikkattil

19

violated its Code of Student Conduct. Hence, UMBC's case rests solely on the credibility of its witnesses, Soutry De and David Sweigart. The Appellate Board Decision Letter stated that Mr. Keerikkattil was given the opportunity to refute and question the witnesses. The Appellate Board Decision Letter is attached as **Ex. 11**. However, Dr. Cullen inappropriately interrupted Mr. Keerikkattil questioning the witnesses multiple times thereby preventing effective cross examination of witnesses.

Here's one instance from the Hearing when Dr. Cullen inappropriately intervened when Mr. Keerikkattil was questioning Mr. Sweigart.

**Ranjith Keerikkattil:** You do say that you are a friend with Ms. De, right?

**David Sweigart:** Correct.

**Ranjith Keerikkattil:** And you are not a friend with me and you do not know me before.

**David Sweigart:** I do not know you before.

**Ranjith Keerikkattil:** Exactly. So, if I allege that you are supporting Ms. De and you are providing a false testimony for Ms. De, do you have any evidence to support that you are an unbiased witness.

**David Sweigart:** I have nothing to benefit from this.

**Ranjith Keerikkattil:** Do you take classes with Ms. De?

**David Sweigart:** Yes

**Ranjith Keerikkattil:** So isn't that a benefit?


Dr. Cullen then intervenes.

**Jeff Cullen:** Mr. Keerikkattil, your question should be about his testimony but not about things not things that he did not testify. In other words, this is not a Hearing about his conduct.

With this Mr. Keerikkattil was forced to stop cross examining the credibility of Mr. Sweigart. However, Dr. Cullen did not stop his colleague Paul Dillon, the Charging Party who was trying to establish Mr. Sweigart as a credible witness.

**Sagar Bajpai (Chair, Hearing Board):** Charging Party, do you have any question for the witness?

**Paul Dillon:** David what's your relationship with Ms. De?

**David Sweigart:** We are friends. We take classes. We've taken several physics classes together.

**Paul Dillon:** It's a purely platonic relationship?

**David Sweigart:** Yes.

From the above what Paul Dillon asks has nothing to do with Mr. Sweigart's testimony. He was trying to establish Mr. Sweigart as a credible witness. However, Dr. Cullen does not stop him. A double standard.

Further, Mr. Dillon uses this in his closing arguments.

**Paul Dillon:** Mr. Sweigart's testimony is credible and he has no reason to lie.

Credibility of Mr. Sweigart is very important in this case. He had already stated that he was a close friend of Ms. De and had taken a lot of classes with her. Mr. Keerikkattil had found during his investigation that Mr. Sweigart works at the same place as Ms. De in Dr. Michael Hayden's Lab. Besides, Mr. Sweigart from his own statement had admitted that Ms. De shares her homeworks with him, in violation of UMBC's Academic Integrity Policy under which students could be suspended or dismissed from UMBC for plagiarism. Mr. Sweigart has a lot to benefit by providing a false or misleading testimony for Ms. De. Further, Mr. Sweigart's testimony was short of specifics and it appeared as if he had been coached. In fact, parts of his testimony at the Hearing contradicted his statements made before the Hearing as well as statements made by Ms. De.

Mr. Keerikkattil would be willing to present more evidence of Dr. Cullen interfering with his questioning of UMBC's witnesses if required by the Court.

### Soutry De's claims false, misleading and contradictory

Soutry De stated that she saw Mr. Keerikkattil following her home in April 2012. However, Ms. De and Mr. Keerikkattil became friends on Facebook in early May 2012, **Ex. 12**. No one with common sense would become friends with someone whom she suspects is following or harassing her. However, when asked for any evidence to support her claims, she said she has none. She stated that Mr. Keerikkattil said to her that he was going to Giant Supermarket the day she alleged that he had followed her. Of all the places, Giant raises a red flag because there is a Giant opposite to Mr. Keerikkattil's home at a walkable distance on 4622 Wilkens Avenue, **Ex. 13**. So her claim cannot be true since there is no logical reason for Mr. Keerikkattil to go to a

Giant that's more than 4 miles from his home when there's one less than 0.2 miles away at a walkable distance. Ms. De and Mr. Keerikkattil used to work together even after April and she never raised it to him or anyone else at the workplace during this period. In short, the claim by Ms. De that she saw Mr. Keerikkattil following her home in April 2012 was fabricated to strengthen her claims.

Again, Ms. De stated on her Peace Order petition that Mr. Keerikkattil showed up at her home uninvited on July 8, 2012. While investigating, Mr. Keerikkattil found a Facebook posting made by Ms. De that shows her in Las Vegas on July 8, 2012, **Ex. 14**. When confronted with this evidence, Ms. De then stated that she made a "mistake" on her Peace Order petition. The Peace Order petition clearly states that "An individual who knowingly provides false information in a petition for Peace Order is guilty of a misdemeanor and on conviction is subject to a fine not exceeding $1,000 or imprisonment not exceeding 90 days or both" under Md. Courts and Judicial Proceedings Code Ann. § 3-1503(d). The general rule under common law is that "ignorance of the law or a mistake of law is no defense to criminal prosecution." *Cheek v. United States*, 498 U.S. 192 (1991). Hence by her own admission, Ms. De had most likely violated § 3-1503(d).

Ms. De stated in her complaint to UMBC Police that she saw Mr. Keerikkattil looking at her during Summer 2012 and felt threatened. During the Hearing, her testimony changed to she saw Mr. Keerikkattil on a public space working on his laptop and she didn't see where his eyes were. Later, when asked why she didn't contact Police that time, her answer was he didn't try to contact her and hence was not threatened. This contradicts her own claims made before. This also contradicts almost all of UMBC charges against Mr. Keerikkattil because Ms. De now states that she wasn't threatened by his physical presence.

23

Ms. De stated in her complaint to UMBC Police that Mr. Keerikkattil threatened her by talking to her "Hello. How are you doing?" at UMBC Library on September 29, 2012 at 3 PM. Mr. Keerikkattil had presented receipts before the Hearing to show that he was at The Mall in Columbia at this time. Knowing this, Ms. De then changed the time to between 4 and 5:30 PM. From all this it is quite clear that Ms. De knowingly would have made false statements with UMBC Police in violation of Md. Criminal Law Code Ann. § 9-501.

Ms. De then tried to take out a Peace Order against Mr. Keerikkattil. The judge dismissed her peace order petition ex-parte at the temporary stage. In dismissing her petition, the judge specifically ruled that Mr. Keerikkattil was not a threat to her in any form. Finding that she couldn't establish the burden of proof under criminal law or even for a Temporary Peace Order, she came up with the idea along with Mr. Dillon of using UMBC's Judicial System where they could use their influence find Mr. Keerikkattil responsible. The Student Judicial process against Mr. Keerikkattil was nothing but a carefully planned and calculated action by her to cause him great harm that she could not achieve through the state courts.

On the contrary, it was Mr. Keerikkattil who had voluntarily quit his job at Community College of Baltimore County ("CCBC") which he had held for the past four years because of her harassment as well as false and misleading claims against him. Ms. De did continue to work there after he left. If Mr. Keerikkattil wanted to stalk her as she claims, then quitting his job at CCBC would be the last thing he would do since continuing the job would have made it easy for him to stalk her. Also, a District Judge did find Ms. De responsible for harassing Mr. Keerikkattil and ordered her to refrain from harassing, stalking or threatening Mr. Keerikkattil, again contradicting her claims, **Ex. 15.**

24

**UMBC Retaliated against Mr. Keerikkattil**

"The First Amendment right of free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). A Plaintiff seeking to recover for First Amendment retaliation would need to allege that (1) he engaged in protected First Amendment activity, (2) the Defendants took some action that adversely affected his First Amendment rights, and (3) there was a causal relationship between his protected activity and the Defendants' conduct. *Id.* at 686.

Mr. Dillon himself had said during the Hearing that he was initially looking for a six month suspension but then wanted an indefinite suspension and campus ban since Mr. Keerikkattil challenged his claims during the Hearing. Mr. Keerikkattil was given over one year to indefinite suspension, ban from UMBC Campus till 2016 and 100 hours of Community Restitution, **Ex. 7**. All Mr. Keerikkattil was doing was exercising his First Amendment rights. Had Mr. Keerikkattil not exercised his First Amendment rights and not challenged the Charging Party's claims, he wouldn't have been subjected to these severe sanctions.

Not only did UMBC harm him academically by suspending him, it also threatened him with criminal charges by just being present on UMBC Campus, which is open to the public, thereby restricting his freedom of movement. It also abruptly terminated his myUMBC account thereby chilling his free speech even when he had not violated any of UMBC Policies for Responsible Computing. UMBC feared that Mr. Keerikkattil could use the message boards and mailing lists thru his myUMBC account to share his plight with other UMBC students thereby

25

creating bad publicity for the University and increased scrutiny into its actions against him.

## UMBC failed to follow Title IX Regulations

Title IX provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

On November 5, 2012, Mr. Keerikkattil met with Defendants Dillon and Cullen for Pre-Hearing conference. He asked Dr. Cullen what the basis for applying these charges were since he was never an enrolled student at the university during the time of these allegations. He looked confused. At this time Mr. Dillon began whispering the word "ban" to Dr. Cullen. Mr. Keerikkattil was asked to go out of the room and Mr. Dillon talked with Dr. Cullen in private. After about half-an-hour, Mr. Keerikkattil was asked back in and he was served with a unilateral and one-sided No Contact Order that put Mr. Keerikkattil at the risk of further sanctions, **Ex. 16**. When asked about why the order was unilateral when no investigation was done and Mr. Dillon did not have any evidence, they said Ms. De is more believable since she is a woman.

Under the equitable standard of Title IX, both Mr. Keerikkattil and Ms. De have equal rights. Issuing a one-sided No Contact Order against only Mr. Keerikkattil that threatens him with more sanctions, when no such order was issued against Ms. De fails the equitable standard under Title IX.

Further Dr. Cullen refused to allow Mr. Keerikkattil access to the Pre-Hearing recording before the Hearing as early as November despite his multiple requests. This recording would have clearly proven Title IX violations against UMBC. Again, when Mr. Keerikkattil asked for

26

the recording in April 2013, UMBC then said that the audio recorder malfunctioned, **Ex. 17**. Mr. Keerikkattil strongly believes that the audio recording was intentionally destroyed since it would support his Title IX claims and incriminate Defendants Cullen and Dillon. It would be highly unlikely that the audio recorder malfunctioned not once or twice but twenty three times and no one at UMBC noticed it especially when the Pre-Hearing Conference forms a very important part of the Student Judicial Process at UMBC. Also, the video portion of the recording which UMBC showed Mr. Keerikkattil was only 25 minutes when the Pre-Hearing Conference lasted more than an hour. This indicates that UMBC might have also edited the video recording too.

## UMBC's sanctions were arbitrary and capricious

Dr. Cullen imposed arbitrary and capricious sanctions against Mr. Keerikkattil without any basis or precedent to support his sanctions. Arbitrary and capricious sanctions against Mr. Keerikkattil are a violation of his due process rights. *Gargiul v. Tompkins*, 704 F.2d 661, 668 (2d Cir. 1983) ("If [the Plaintiff's] lengthy suspension without pay resulted from an arbitrary or capricious exercise of the Board's power, her due process rights were violated."); *Thompson v. Bass*, 616 F.2d 1259, 1267 (5th Cir. 1980) (finding that public employee who had a property interest in continued employment could establish a denial of substantive due process if termination was the result of arbitrary or capricious action).

Dr. Cullen failed to explain Mr. Keerikkattil the basis for the sanctions despite Mr. Keerikkattil repeatedly asking him. Davonya Hall, Dr. Cullen's deputy stated in the Appellate Board Decision Letter stated that the sanctions against Mr. Keerikkattil were consistent with sanctions for violations of Rule 2, **Ex. 5 at 6**. However, Rule 2 contains anything from indecent

27

exposure to rape and it would be incredulous to believe that a student found responsible for drug overdose would get the same sanctions as a student found responsible for rape.

Mr. Keerikkattil was given over one year to indefinite suspension, ban from UMBC Campus till 2016 and 100 hours of Community Restitution. Interestingly, the Charging Party i.e. Mr. Dillon himself had said during the Hearing that he was initially looking for a 6 month suspension but wanted an indefinite suspension and campus ban since Mr. Keerikkattil challenged his claims. Mr. Keerikkattil has this statement made by Mr. Dillon on record. In other words, the sanctions against Mr. Keerikkattil were imposed intentionally and with malice to maximize the injury they could inflict upon him. These sanctions were not based on any precedents or guidelines and hence were arbitrary and capricious.

**UMBC's Rule 2 and its definition of stalking vague and overbroad**

UMBC defines stalking in its Code of Student Conduct.

*Article III AA of UMBC Code of Student Conduct* defines the term "stalking" as:

*AA. The term "stalking" means any course of conduct directed at a particular individual that would cause a reasonable person to fear for their immediate health or safety or that of others. Stalking conduct includes, but is not limited to repeatedly following, pursuing, waiting, or showing up uninvited at a workplace, residence, classroom, or other locations frequented by a victim; unwanted surveillance and other types of observation, whether by physical proximity or electronic means; repetitive and unwanted communication such as by telephone, voice mail, text, or instant messages, social networking site postings, written letters, or gifts; and unwanted gathering of*

28

*information about a victim from classmates, friends, co-workers, or family.*

To establish the crime of stalking under federal law, the government must prove beyond a reasonable doubt that (1) the Defendant traveled in interstate commerce; (2) such interstate travel was with intent to injure or harass the victim; and (3) during or after such travel, the Defendant committed an act of placing the victim in reasonable fear of death or serious bodily injury. 18 U.S.C.A. § 2261A; *United States v. Wills*, 346 F.3d 476, 493-94 (4th Cir. 2003).

The State of Maryland's definition of stalking (§ 3-802) is clear and precise and requires proof of threat:

*(i) of serious bodily injury;*

*(ii) of an assault in any degree;*

*(iii) of rape or sexual offense as defined by §§ 3-303 through 3-308 of this title or attempted rape or sexual offense in any degree;*

*(iv) of false imprisonment; or*

*(v) of death*

Both Federal and State of Maryland definition of stalking requires the threat of serious bodily injury or death. However, UMBC's definition of stalking does not require any threat of serious bodily injury or death. In fact, UMBC's definition of stalking is so vague and overbroad that it's void for vagueness.

A statute is unconstitutionally vague under the Due Process Clause if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008); *see also South Carolina Medical Ass'n v. Thompson*, 327 F.3d 346, 354

29

(4th Cir. 2003).

UMBC's definition of stalking and Rule 2 contains nebulous terms like "health" and "safety" that it does not define. So the health could be emotional health and safety could be emotional safety.

UMBC had already acknowledged before that terms like "intimidation," "emotional harassment," and "emotional safety" that constitute Rule 2 were unconstitutionally vague and overbroad in the *Rock for Life-UMBC v. Hrabowski* lawsuit. "At the preliminary injunction Hearing on August 8, 2008, Defendants informed the Court that UMBC was voluntarily changing its Code of Student Conduct, Code of Student Organization Conduct, and Residential Life policies (collectively, "Codes of Conduct") to remove the terms "intimidation," "emotional harassment," and "emotional safety" which Plaintiffs challenged as unconstitutionally vague and overbroad." *Rock for Life-UMBC v. Hrabowski*, 594 F. Supp. 2d 598, 603 (D. Md. 2009).

In fact, during the Hearing, the Hearing Board specifically asks Dr. Cullen for the definition of "health" and "safety" and he himself said to the Hearing Board that these terms were "nebulous" quoting the *Rock for Life-UMBC v. Hrabowski* lawsuit.

Further, in the Charge Letter against Mr. Keerikkattil, two of the allegations were "place of work, or places where she frequents more than once" that he says falls under UMBC's definition of stalking. First of all, Mr. Keerikkattil and Ms. De used to work together. So, according to him Mr. Keerikkattil could be found responsible for showing up at work. Further, he does not provide any details regarding "places where she frequents more than once". So according to him Mr. Keerikkattil could be found responsible for stalking if Ms. De saw him in the UMBC Library since she could claim that it is a "place where she frequents more than once".

30

In short, UMBC's definition of stalking and Rule 2 are so vague and overbroad that UMBC Administrators like Dr. Cullen could easily misuse it to punish harmless actions. In fact, none of the other Universities within the University System of Maryland have such vague and overbroad definitions of stalking.

**Defendants were negligent towards Mr. Keerikkattil**

**Md. Education Code Ann. § 12-106.** *Plan for and administration of University*

*(f) Discipline of students; conduct of student organizations and athletic programs. -- In consultation with the Chancellor and the presidents, the Board may adopt policies providing for:*

*The discipline, suspension, expulsion, or reinstatement of any student;*

**COMAR 13B.02.02.19.F.**

*An in-State institution shall develop a statement of the rights, privileges, and responsibilities of students, and make this statement available to students through the catalog, student handbook, or other appropriate means.*

**COMAR 13B.02.02.19.G.**

*An in-State institution shall adhere to published student grievance procedures that assure a fair and timely review of student complaints.*

**Md. Education Code Ann. § 12-106 (f)** states that the Presidents of USM Institutions, the Chancellor and Board of Regents of University System of Maryland (USM) are responsible for adopting policies regarding discipline, suspension, expulsion, or reinstatement of any student. The above statute clearly demonstrates that Dr. Hrabowski, Dr. Kirwan and the Board of Regents

31

of University System of Maryland are directly responsible for UMBC's policies regarding student discipline. Further, **COMAR 13B.02.02.19.F.** and **COMAR 13B.02.02.19.G.** states that UMBC has to publish the rights, privileges, and responsibilities of students and should adhere to them. UMBC publishes the rights, privileges, and responsibilities of students in its Student Handbook and Code of Student Conduct. The Code of Student Conduct as detailed below states that the University would establish procedures and rights to ensure due process and promises to follow them.

### Article I. Student Conduct and Judicial Affairs Mission

*The University of Maryland Baltimore County is strongly committed to the development of the student and promotion of personal integrity and self-responsibility. Students enrolling at UMBC become citizens of the community and are entitled to enjoy the privileges and required to assume the responsibilities associated with this affiliation. UMBC affirms its commitment to achieving diversity in higher education and continues to improve the quality and increase the diversity of its student body. The University consistently strives to create a community that welcomes and celebrates differences. Since the rights of all students are protected, and an atmosphere conducive to intellectual development, personal growth, and community association are to be promoted, standards and guidelines on student behavior are necessary. This Code of Student Conduct is intended to outline certain responsibilities and expectations of UMBC students, assist the students to understand their role in the academic community, and to establish procedures that ensure due process in the adjudication of complaints concerning students.*

32

    **B. The primary purpose of this Code of Student Conduct is to serve the interests of both the UMBC community and the individual student by: (1) prescribing the standards of conduct expected of students; (2) outlining actions which can be taken when misconduct occurs; (3) establishing procedures which ensure due process in the adjudication of complaints concerning students; and (4) imposing sanctions in the University setting to protect, deter, and educate.**

    **C. The Student Judicial Programs Office promotes the concepts of fairness and due process in Student Conduct Review settings throughout the University community, while striking a balance between community standards and individual behavior through the educational development of students.**

In Maryland, to succeed on a negligence claim, a Plaintiff needs to prove that "'(1) that the Defendant was under a duty to protect the Plaintiff from injury, (2) that the Defendant breached that duty, (3) that the Plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the Defendant's breach of the duty.'" *BG & E v. Lane*, 338 Md. 34, 43, 656 A.2d 307, 311 (1995) (quoting *Rosenblatt v. Exxon*, 335 Md. 58, 76, 642 A.2d 180, 188 (1994)); *see also Todd v. Mass Transit Administration*, 373 Md. 149, 155, 816 A.2d 930, 933 (2003). Also, "In Maryland, the violation of a statute which is a cause of a Plaintiff's injury is evidence of negligence". *Absolon v. Dollahite,* 376 Md. 547, 831 A.2d 6 (2003).

According to **Md. Education Code Ann. § 12-106 (f)** and **COMAR 13B.02.02.19.G.**, the Defendants owed a statutory duty to protect Mr. Keerikkattil from injury or loss. By failing to follow its own written down rights, policies and procedures, the Defendants breached their duty to protect him thereby causing suffer irreparable harm, injury, damages, including but not limited

33

to, monetary damages, loss of educational opportunities, loss of career opportunities and earning capacity, mental and emotional distress, anxiety and mental anguish, humiliation and embarrassment; and loss of personal and professional reputation.

## UMBC and USM Administrators liable for sanctions against Mr. Keerikkattil

For a Plaintiff to maintain a claim against a supervisor under § 1983, he would need to show (1) that the supervisor had actual or constructive knowledge that his subordinate[s were] engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to . . . Plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the Plaintiff. *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (internal quotation marks omitted).

Mr. Keerikkattil had written to Freeman Hrabowski, the President of UMBC and Nancy Young, Vice President of Student Affairs at UMBC even before the Hearing expressing his concerns regarding Dr. Cullen and Mr. Dillon and if he would get a fair and unbiased Hearing under UMBC's judicial system, **Ex. 18**. Faced with delays on his appeal, he again wrote to Dr. Hrabowski, who replied back apologizing for the delays, **Ex. 19.** Finding that UMBC Administration was unwilling to address his concerns, Mr. Keerikkattil wrote to William Kirwan, Chancellor of the University System of Maryland and Janice Doyle, Chief of Staff to the Board of Regents of the University System of Maryland. After reviewing Mr. Keerikkattil's allegations, Ms. Doyle informed him that they had forwarded his allegations to the Office of Attorney

34

General for review. Also, Ms. Tracey Jamison, Director of Enrollment contacted Mr. Keerikkattil to let him know that she is awaiting review from the Office of Attorney General and would get back to him. However, Mr. Keerikkattil never got a response back on his allegations. He even contacted back Ms. Doyle, Ms. Jamison as well as Mr. Thomas Faulk, the Chief Counsel for The Board of Regents at the Office of Attorney General but got no reply. The e-mail thread is attached as **Ex. 20.** It was clear to him that the University System of Maryland like UMBC Administration had taken the policy of deliberate indifference to his plight exacerbating his injuries.

### Defendants' actions undeserving of qualified immunity

In order for the Plaintiff to claim damages under § 1983, they must establish not only that the Defendants deprived them of a constitutional right, but also that the Defendants, state actors sued in their individual capacities, are undeserving of qualified immunity. *Harlow v. Fitzgerald*, 457 U.S. 800, 808-09, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). Whether a government official is deserving of qualified immunity from personal liability is a two-pronged inquiry that requires the court to determine: (1) whether the official violated a constitutional right; and if so (2) whether the right was "clearly established" at the time of its violation. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). However, the Supreme Court overruled Saucier in part to hold that the traditional two-step inquiry into qualified immunity is not mandatory; "the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 813, 818, 172 L. Ed. 2d 565 (2009).

Since UMBC explicitly publishes the Student Due Process Rights on its SJP website, it is clear that the Defendants specifically Dr. Cullen knew about them at the time of violation. So this satisfies the "clearly established" requirement of (2) whether the right was "clearly established" at the time of its violation. Then we analyze (1) whether the official violated a constitutional right. Due process clause is clearly defined in the Fourteenth Amendment of the U.S. Constitution.

> *Amendment XIV*
>
> **Section 1. All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law.**

By depriving Mr. Keerikkattil his Due Process Rights, the Defendants committed a clearly established constitutional violation and hence should be underserving of qualified immunity. Mr. Keerikkattil had already established that the Defendants acted with malice.


## Civil conspiracy and malicious use of civil process

Under Maryland law, civil conspiracy requires "1) [a] confederation of two or more persons by agreement or understanding; 2) some unlawful or tortious act done in furtherance of the conspiracy or use of unlawful or tortious means to accomplish an act not in itself illegal; and 3) [a]ctual legal damage resulting to the Plaintiff." *Lloyd v. General Motors Corp.*, 397 Md. 108, 154 (2007) (citing *Van Royen v. Lacey*, 262 Md. 94, 97-98 (1971); *Damazo v. Wahby*, 259 Md.

627 (1970); *Green v. Washington Suburban Sanitary Comm'n*, 259 Md. 206, 221 (1970)) (internal quotations omitted).

To state a claim for malicious use of civil process under Maryland law, a Plaintiff would need to allege that "(1) a prior civil proceeding was instituted by the Defendant; (2) with malice; (3) without probable cause; (4) termination in favor of the Plaintiff; and (5) damages were inflicted upon the Plaintiff by arrest or imprisonment, seizure of property, or other special injury." *Fontell v. Hassett*, 2011 WL 4632579, at * 5 (D. Md. Oct. 3, 2011) (citing *Keys v. Chrysler Credit Corp.*, 494 A.2d 200, 205 (Md. 1985)).

Dr. Cullen, Mr. Dillon and Ms. De conspired to ban him from campus and impose sanctions against Mr. Keerikkattil to prevent him from continuing his education by maliciously abusing the student judicial system at UMBC.

Ms. De along with Mr. Dillon accessed Mr. Keerikkattil's friends list on Facebook. Mr. Dillon used his position as Deputy Chief of UMBC Police to compel them to write statements against him that placed him in a false light, **Ex. 21**. They then used them as evidence in the Hearing. Mr. Dillon never even tried to investigate Ms. De's claims but did say that her testimony is "100% credible" at the Hearing. Mr. Dillon himself had appeared twice in state courts to defend Ms. De accused for harassing and stalking Mr. Keerikkattil. Even though the case against her had nothing to do with UMBC, he appeared in his official capacity to defend her while billing the State of Maryland for his services. As a public employee during this time he would most likely have deprived UMBC and State of Maryland of his honest services in violation of 18 U.S.C. § 1346.

On the day of the Hearing Dr. Cullen, Mr. Dillon and Ms. De met in a closed room.

37

Within a couple of minutes after the meeting Dr. Cullen sent Mr. Keerikkattil stating that Ms. De had been conferred "victim" status, **Ex. 8**. A "victim" under FERPA means a victim of "crime of violence" or a "nonforcible sex offense". Ms. De was represented pro bono by Sexual Assault Legal Institute (SALI) where she was a Defendant at the Circuit Court for Baltimore County on January 15, 2013, **Ex. 22**. According to SALI's website:

> *The Sexual Assault Legal Institute (SALI) is a program of the Maryland Coalition Against Sexual Assault (MCASA). SALI provides direct legal services for victims and survivors of sexual assault.*

Ms. De and UMBC Defendants would have lied or misrepresented facts to secure pro bono legal assistance to Ms. De by portraying her as a victim of sexual assault when she was in fact a Defendant in this case and there had been absolutely no inappropriate or non-consensual sexual contact between Mr. Keerikkattil and Ms. De. Mr. Tkacik, the University Counsel's own statement supporting SALI indicates that UMBC was involved with this. Further, Mr. Tkacik himself was present in the Court along with Mr. Dillon in a case that had nothing to do with UMBC. Also, Ms. De's attorney did use the sanctions against Mr. Keerikkattil in her defense. FERPA would have prevented such a disclosure unless Ms. De was conferred "victim" status. In other words, these sanctions were deliberately imposed against Mr. Keerikkattil to portray him in a false light so that they could be used in Ms. De's defense.

The student judicial process against Mr. Keerikkattil was a malicious use of civil process by Dr. Cullen, Mr. Dillon and Ms. De. From the beginning, Defendants had presumed him guilty by banning him from campus and issuing one-sided No Contact Orders against him. Further, the Defendants through their tortious acts explained above and below in this brief deprived the

Plaintiff his right for a fair and unbiased trial causing him to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

## Mr. Keerikkattil was deprived of Due Process protections under Brady Disclosure and Jencks Act

Dr. Cullen conferred Ms. De "victim" status abruptly just before the Hearing. A "victim" under FERPA means a victim of "crime of violence" or a "nonforcible sex offense". Had such an allegation made against him in a court of law, he would have received his due process protections under Brady Disclosure and Jenks Act. Many Courts have even gone further and recognized that they also apply to individuals subject to disciplinary proceedings.

In *Brady v. Maryland*, 373 US. 83, 87 (1963), the United States Supreme Court held that the government is obligated by the Due Process Clause of the United States Constitution to turn over all material exculpatory information in a criminal prosecution. Courts have gone further and recognized that an individual subject to disciplinary action must generally be allowed to access all exculpatory information within the possession and control of the administrative body. *EEOC v. Los Alamos Constructors*, Inc., 382 F. Supp. 1373, 1383 (D.N.M. 1974) ("Fair play, a fair trial, and the requirements of due process of law demand that Defendant be permitted to find out in advance of trial what the [EEOC's] case is all about"); *Id* at 1383 n.5 ("Brady [ ] orders that exculpatory information must be furnished a Defendant in a criminal case. A Defendant in a civil case brought by the government should be afforded no less due process of law."); *Sperry &*

39

*Hutchinson Co. v. FTC*, 256 F. Supp. 136, 142 (S.D.N.Y. 1966) ("Presumably the essentials of due process at the administrative level require similar [Brady] disclosures by the agency where consistent with the public interest. In civil actions, also, the ultimate objective is not that the Government 'shall win a case, but that justice shall be done.'");

Jencks rule requires that prior statements of witnesses in the possession of the government be turned over to the Defendant for use in cross-examination where such statements relate to the witness's testimony. 18 U.S.C. § 3500. The Jencks rule is intended to provide Defendants with the means and opportunity for thorough cross-examination of government witnesses. *United States v. Aaron*, 457 F.2d 865, 869 (2d Cir. 1972).

Although the Jencks rule is set forth in a federal statute and state criminal rules, a number of courts have concluded that the principle of the Jencks rule is applicable to administrative proceedings as well. *NLRB v. Adhesive Prods. Corp.*, 258 F.2d 403, 408 (2d Cir. 1958) ("In our opinion, logic compels the conclusion that [Jencks] rules are applicable to an administrative Hearing"); *Chief Montgomery County Department of Police v. Jacocks*, 436 A.2d 930, 936 (Md. Ct. Spec. App. 1981) ("Administrative agencies . . . must observe the basic rules of fairness, and that is what the Jencks rule is all about"); *Greco v. State Police Merit Board*, 245 N.E.2d 99, 102 (Ill. App. Ct. 1969) ("Since the Board uses an adversary procedure to perform its investigation, a fair and unbiased result can obtain only if both adversaries are allowed to present a full case and are allowed to rebut the opposition. Depriving the defense of pre-trial statements of opposition witnesses who testify greatly impairs such full presentation and rebuttal and obliterates the opportunity for meaningful cross-examination."); *Barbour v. People of the State of New York*, 620 N.Y.S.2d 892, 894 (N.Y. Sup. Ct. 1994) (collecting federal cases holding that

Jencks rule is applicable in administrative proceedings).

Of course, the right to cross-examination is rendered meaningless if the respondent is denied access to the information necessary to effectively question UMBC's witnesses. Among the most important information necessary for effective cross-examination are witness statements and material exculpatory information. Mr. Keerikkattil was provided with none of them by the University before the Hearing.

**Lack of transparent appellate process**

Chris Tkacik served Mr. Keerikkattil at the Circuit Court of Baltimore County, a letter on January 15, 2013 that he said was the decision of the Appellate Board written by Davonya Hall, Dr. Cullen's deputy, **Ex. 11**. According to the letter, Ms. Hall wrote that Appellate Board met on January 11, 2013 and upheld sanctions against Mr. Keerikkattil. The letter was used at the Circuit Court where Ms. De was a Defendant, for her defense. Mr. Keerikkattil was quite sure that neither did the Appellate Board meet on January 11th nor did they uphold the sanctions against him. So he asked both Ms. Hall and Mr. Tkacik to confirm under penalty of perjury that they witnessed the meeting of Appellate Board and the approval of sanctions against him **Ex. 20 at 9, 14**. Both of them declined. Obviously, as attorneys, they both know the consequences of providing false information under penalty of perjury.

**UMBC does not have jurisdiction over Mr. Keerikkattil**

None of the allegations raised against Mr. Keerikkattil occurred when he was an enrolled student at UMBC. Hence, irrespective of the factual accuracy of the allegations against him, Mr.

41

Keerikkattil cannot be held responsible under UMBC Code of Student Conduct for allegations that fall outside the jurisdiction of UMBC and SJP in both "venue" and "time".

### Defamation

Under Maryland law, a Plaintiff who is not a public figure may establish a prima facie case of defamation by showing: "(1) that the Defendant made a defamatory statement to a third person, (2) that the statement was false, (3) that the Defendant was legally at fault in making the statement, and (4) that the Plaintiff thereby suffered harm." *Independent Newspapers, Inc. v. Brodie*, 966 A.2d 432, 441 (Md. 2009) (internal quotation marks omitted). "A defamatory statement is one which tends to expose a person to public scorn, hatred, contempt or ridicule, thereby discouraging others in the community from having a good opinion of, or associating with, that person." Id. (internal quotation marks omitted).

Ms. De's claim that Mr. Keerikkattil stalked her is false and malicious. Ms. De's claim that Mr. Keerikkattil followed her home is false. Ms. De's claim that Mr. Keerikkattil threatened her in any form is false and misleading. Ms. De made these remarks to third parties with the knowledge of the falsity of the statements or in reckless disregard of truth or falsity. Ms. De's statements were not privileged. As a direct and proximate result of Ms. De's false and misleading statements, Mr. Keerikkattil suffered and will continue to suffer irreparable harm, injury, damages, including but not limited to, monetary damages, loss of educational opportunities, loss of career opportunities and earning capacity, mental and emotional distress, anxiety and mental anguish, humiliation and embarrassment; and loss of personal and professional reputation.

42

**B.      Mr. Keerikkattil will suffer irreparable harm if the injunction is not granted.**

It is well-settled that the violation of constitutional rights for even minimal periods of time constitutes irreparable injury justifying the grant of preliminary injunction. See *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981) (citing, e.g., *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); see also *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) ("[A]n alleged constitutional infringement will often alone constitute irreparable harm."). For purposes of injunctive relief, an injury is also "irreparable" if it cannot be undone through monetary remedies. *Spiegel v. City of Houston*, 636 F.2d 997, 1002 (5th Cir. 1981); *Parks v. Dunlop*, 517 F.2d 785, 787 (5th Cir. 1975). Monetary damages cannot compensate for "the loss of intangible rights that cannot be bought or sold in the marketplace." *Nobby Lobby, Inc. v. City of Dallas*, 767 F. Supp. 801, 821 (N.D. Tex. 1991); see also *Dearmore v. City of Garland*, 400 F. Supp.2d 894, 905 (N.D. Tex. 2005) ("[C]onstitutional violations should be enjoined as soon as practicable; otherwise, the Constitution is of little value."). Therefore, no further showing of irreparable injury is necessary where a constitutional deprivation is involved.

Irreparable harm was done to Mr. Keerikkattil when his due process rights were violated. UMBC's arbitrary and capricious sanctions have and would jeopardize his chances of educational and employment opportunities. This harm would likely reverberate through his professional career for years to come.

Mr. Keerikkattil was to start a new position with Booz Allen Hamilton in November 2012. Because of UMBC's allegations against him, Mr. Keerikkattil was forced to choose either to take the new job or defend against these allegations. Hence, Mr. Keerikkattil had to give up his new job thereby losing thousands of dollars and a promotion, **Ex. 23**. Also, because of

UMBC's sanctions, he had lost his Maryland State Senatorial Scholarship that he had since 2008, **Ex. 24**.

Mr. Keerikkattil should not be required to wait for a final adjudication on the merits to have the opportunity to pursue his studies that allow him to achieve his full potential.

### C.     The Equities Weigh Heavily in Favor of Granting the Requested Relief.

As outlined above, Mr. Keerikkattil would likely suffer irreparable injury in the absence of an injunction. By contrast, the harm an injunction would cause UMBC is nonexistent.

First of all UMBC has not proven that Mr. Keerikkattil is a threat to anyone on campus. Mr. Keerikkattil obtained his undergraduate degree from UMBC in 2010 and from 2007-2010 when he was an undergraduate student, no member of the UMBC community ever raised any allegations of misconduct against him. Further from 2010-2012, Mr. Keerikkattil used to use the UMBC Library and Campus as an alumnus and there were no allegations of misconduct against him. The sanctions against him were based solely on unsubstantiated allegations made by Ms. De, who had an estranged relationship with Mr. Keerikkattil with whom she was formerly a friend and colleague. Ms. De has not presented any credible evidence that proves that Mr. Keerikkattil had threatened her and her aim was to humiliate him and to deprive him of his ability to continue his education.

UMBC would face no harm by an injunction. Ms. De herself had stated that she would be graduating in Spring 2013 and have done so. So, UMBC's unsubstantiated claim that Mr. Keerikkattil is a threat to Ms. De has no relevance after Spring 2013 semester. Further, no

other member of the UMBC community has ever indicated that Mr. Keerikkattil is a threat to him/her. Besides, an injunction would not cost UMBC a penny and conversely would only benefit financially in the form of tuition payments.

Accordingly, the balance of equities tips decidedly in Mr. Keerikkattil's favor.


**D.     Granting the Preliminary Injunction Will Advance the Public Interest.**

Granting the injunctive relief requested by Mr. Keerikkattil is consistent with due process protections afforded to him as a U.S. Citizen by the Fourteenth Amendment of the U.S. Constitution. As explained before in detail, students at public universities are protected by Due Process Rights. It is important to ensure that students at public universities are not subjected to arbitrary and capricious sanctions without the due process of law. If UMBC is not held accountable and answerable for its actions, it will continue to deprive other students their opportunity to pursue their education and succeed in their lives and careers. Besides, it is in public interest that UMBC should be held accountable for the promises that it makes to its students under its Student Handbook and Code of Student Conduct. It's also in public interest to ensure that students at UMBC are not retaliated for exercising their First Amendment rights. Mr. Keerikkattil was given more serious sanctions by UMBC since he exercised his First Amendment rights and questioned the integrity and fairness of its student judicial process. A preliminary injunction would also prevent the continued violation of the Plaintiffs' Title IX rights as well as Title IX rights of other students. The public interest is certainly served by promoting compliance with Title IX. *Barrett v. West Chester Univ. of Pa. of State Sys. of Higher Educ.*, No. 03-cv-4978, 2003 WL 22803477, at \*15 (E.D. Pa. Nov. 12, 2003); *Cohen v. Brown Univ.*, 809 F. Supp. 978,

1001 (D.R.I. 1992).

**II. Mr. Keerikkattil is prepared to post a bond.**

The Fourth Circuit has interpreted Federal Rule of Civil Procedure 65(c) to mean that "[a]lthough the district court has discretion to set the bond amount 'in such sum as the court deems proper,' it is not free to disregard the bond requirement altogether." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999). Since an injunction would not impose any financial burden on UMBC, the Plaintiff requests the Court that only a nominal bond of $1 be imposed on him to secure this preliminary injunction.

**CONCLUSION**

For the reasons stated above, Plaintiff respectfully requests that the Court issue a preliminary injunction and order UMBC to comply with them. To the extent that Defendants dispute the factual allegations of Plaintiff in this motion, Plaintiff requests an opportunity to present evidence at a Hearing.

Respectfully submitted,

Ranjith Keerikkattil
Plaintiff, pro se
4707 Grand Bend Drive
Catonsville, MD 21228
Telephone: (443) 690-1031
rkeerikkattil@gmail.com

46